739 So.2d 893 (1999)
Randa B. Hall TANNER
v.
REYNOLDS METALS COMPANY and Carl Anderson.
No. 98 CA 1456.
Court of Appeal of Louisiana, First Circuit.
June 25, 1999.
*894 Jill Craft, Baton Rouge, for Plaintiff-Appellant Randa B. Hall Tanner.
William R. D'Armond, Baton Rouge, for Defendant-Appellee Reynolds Metals Company.
Carl Anderson, Port Allen, Defendant-Appellee, pro se.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
The instant suit was filed by Randa B. Hall Tanner to recover damages for alleged sexual harassment that she endured while an employee at Reynolds Metals Company ("Reynolds"). Reynolds filed a motion for summary judgment asserting that it was not responsible for any alleged conduct by its employee, Carl Anderson. The trial court concluded that there was no genuine issue of material fact and that Reynolds was entitled to judgment as a matter of law. Summary judgment in favor of Reynolds was granted, dismissing Ms. Tanner's claims with prejudice.
Ms. Tanner now appeals this judgment. For the following reasons, we affirm the trial court's judgment granting summary judgment in favor of Reynolds.

FACTS AND PROCEDURAL HISTORY
On or about March 13, 1996, Randa B. Hall Tanner was hired by Reynolds as a laborer. According to Ms. Tanner, she was working the night shift at Reynolds on September 21-22, 1996. Sometime after midnight of September 22, 1996, or early September 23, 1996, she encountered another Reynolds' employee, Carl Anderson, who was working as step-up supervisor at the time. Ms. Tanner had gone into the load-out shack to work and noticed that the lights were out. After turning the lights on, she realized that Mr. Anderson was in the load-out shack, and they began discussing what was going to be loaded onto the rail cars. When they walked out onto the catwalk towards the rail cars, Mr. Anderson asked Ms. Tanner if she would be offended if he asked her for some "p* * *y." She told him she was not interested, but he persisted.
Ms. Tanner returned to the load-out shack, and Mr. Anderson followed her in and turned the lights out. He cornered her in a chair and started asking her again *895 for sex. Mr. Anderson pinned her back into the chair. According to Ms. Tanner, he tried to kiss her, grabbed her breasts, and grabbed her between her legs. Ms. Tanner tried pushing him off, and he eventually backed away from her. She was shaking and scared and wanted to get out of the shack and finish her job. When Ms. Tanner got up to get a pen and some paper, Mr. Anderson sat down and pulled her onto his lap. He again was grabbing at her breasts and between her legs, and he ripped her shirt. Ms. Tanner noticed that his penis was exposed, and Mr. Anderson was trying to get her to touch it and sit on it. Mr. Anderson kept saying, "Just a little bit, I've never had a white woman before, you know, let me just try it one time. Have you ever had a black man?" Ms. Tanner kept telling him "no" and tried to get away from him. When Ms. Tanner finally got away from him, Mr. Anderson zipped up his pants, and "was back to business as usual." Later that morning, Ms. Tanner was in the ladies' locker room when Mr. Anderson again approached her. He asked her if she was hiding from him. When Mr. Anderson entered the locker room, he turned the light out and grabbed at her from behind. Ms. Tanner started screaming, and he left. Ms. Tanner finished her shift, and before leaving to go home, she told A.B. "Happy" Perry, the Union representative, what had happened.
Later that afternoon, the supervisor on duty, Brian Leachman, called Ms. Tanner at home to find out what had happened. Joseph DeBeir, human resources manager for the Carbon Products Division of Reynolds, and Robert Stokes, the Union president, were also notified about Ms. Tanner's allegations. Reynolds immediately began an investigation of the incident and interviewed both Ms. Tanner and Mr. Anderson. Mr. Anderson strongly denied Ms. Tanner's allegations. Several other employees of Reynolds were also interviewed. At the request of Mr. DeBeir, James H. Taylor, III, Reynolds' manager of corporate security, also joined in on the investigation.
On September 27, 1996, Ms. Tanner was offered paid leave pending the completion of the investigation. Ms. Tanner was on paid leave for approximately 30 days, and was scheduled to return to work on October 25, 1996. However, according to Ms. Tanner, after September 27, 1996, she never returned to her job at Reynolds. Despite a note from her physician releasing her as of January 1, 1997, to "return to full activity," and the fact that Mr. Anderson had been terminated from Reynolds, Ms. Tanner continually refused to return to work, indicating that she feared for her safety because Reynolds' management had failed to protect her safety and interests. Ms. Tanner remained on unpaid leave until she was finally terminated from Reynolds on April 1, 1998.
On October 24, 1996, Mr. Anderson was notified by letter that he was being suspended for the purpose of discharge. A second letter from Reynolds dated October 31, 1996, advised Mr. Anderson that his employment with Reynolds was terminated effective October 24, 1996. Not only was Mr. Anderson terminated from Reynolds, but he was also barred from the premises.
According to Ms. Tanner's deposition testimony, she had been sexually harassed by other Reynolds' employees prior to the incident with Mr. Anderson on September 22, 1996. She named three other co-employees who had sexually harassed her while at work. Ms. Tanner indicated that the incidents with these three co-workers "occurred frequently" and basically involved flirtatious comments containing sexual innuendoes. She described one incident where one of her co-workers actually kissed her and she pushed him away. Ms. Tanner acknowledged that she had never complained to company officials about these incidents, but explained that she did in fact tell A.B. "Happy" Perry and Mike Smith, another co-worker, about the incidents. Mr. Perry advised her that if it *896 "was to get out of hand," she should report them. Ms. Tanner stated, however, that she was afraid to report the incidents because she did not want "to jeopardize [her] job or anything."
Ms. Tanner filed the instant suit for damages on February 12, 1997. Named as defendants were Reynolds and Mr. Anderson. Among the allegations in Ms. Tanner's petition, she asserted that "[t]he actions and/or inactions of defendants constitute discrimination based on [her] sex, female, under the meaning and intent of the provisions of Louisiana law." As alleged by Ms. Tanner, her petition was "instituted pursuant to the provisions of Louisiana law."
Reynolds filed a general denial to Ms. Tanner's petition, and subsequently filed a motion for summary judgment alleging that it was entitled to judgment as a matter of law. Reynolds sought dismissal of Ms. Tanner's claims on the basis that under Louisiana respondeat superior principles, it was not liable for Mr. Anderson's alleged sexual assault of Ms. Tanner. Following a hearing on this matter, the trial court granted summary judgment in favor of Reynolds and dismissed Ms. Tanner's claims with prejudice. Ms. Tanner filed a motion for new trial that was summarily denied by the trial court.
Ms. Tanner has appealed the trial court's judgment granting summary judgment in favor of Reynolds, assigning the following specifications of error:
1. The trial court erred in finding no liability for the harassment Ms. Tanner endured during her employment with Reynolds.
2. The trial court erred in not finding Reynolds vicariously liable for the sexually harassing behavior of its supervisors.
3. The trial court erred in not finding Reynolds liable where Reynolds failed to prevent and correct sexual harassment in employment.
4. The trial court erred in not finding Reynolds liable under La. C.C. Art. 2320.

SUMMARY JUDGMENT
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Sanders v. Ashland Oil, Inc., 96-1751, p. 7 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1035, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Sanders, 96-1751 at 5, 696 So.2d at 1034. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966 B. Summary judgment is favored and "is designed to secure the just, speedy, and inexpensive determination of every action."[1] La.Code Civ. P. art. 966 A(2).
The burden of proof on a motion for summary judgment remains with the movant. The burden is not shifted to the non-moving party until the mover has properly supported the motion and carried the initial burden of proof. Only then does the amended law require the nonmoving party to "submit evidence showing the existence of specific facts establishing a genuine issue of material fact." Scott v. McDaniel, 96-1509, p. 5 (La.App. 1 Cir. 5/9/97), 694 So.2d 1189, 1191-1192, writ denied, 97-1551 (La.9/26/97), 701 So.2d 991.
*897 We have thoroughly reviewed the record in the instant case and conclude that Reynolds satisfied the initial burden of proof on its motion for summary judgment. Thus, the burden was effectively shifted to Ms. Tanner to "produce factual support sufficient to establish that [she] will be able to satisfy [her] evidentiary burden of proof at trial." See La.Code Civ. P. art. 966 C(2). We agree with the trial court that Ms. Tanner failed in this respect and that Reynolds was entitled to judgment as a matter of law.

LAW AND ANALYSIS
As previously indicated, Ms. Tanner brought this action pursuant to the provisions of Louisiana law, including La. Civ.Code art. 2320, La. R.S. 23:1006, et seq., and La. R.S. 51:2231, et seq. While we recognize a plaintiff's right to bring a sexual harassment suit under each of these provisions, we conclude that in the instant case, Ms. Tanner did not meet the elements required to successfully pursue her sexual harassment claim against Reynolds.
In Louisiana, an employer is liable for a tort committed by its employee, if at the time, the employee is acting "in the exercise of the functions in which they are employed." La. Civ.Code art. 2320. However, an employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during working hours. Baumeister v. Plunkett, 95-2270, p. 10 (La.5/21/96), 673 So.2d 994, 1000.
The Louisiana Supreme Court has held that in order for an employer to be vicariously liable for the tortious acts of its employee, "the tortious conduct of the [employee must be] so closely connected in time, place, and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests." LeBrane v. Lewis, 292 So.2d 216, 218 (La.1974). The particular facts of each case must be analyzed to determine whether the employee's tortious conduct is within the course and scope of his employment. Baumeister, 95-2270 at 4, 673 So.2d at 997.
In LeBrane, the Louisiana Supreme Court considered the following factors in holding an employer liable for a supervisor's actions in stabbing his fellow employee:
1) whether the tortious act was primarily employment rooted;
2) whether the violence was reasonably incidental to the performance of the employee's duties;
3) whether the act occurred on the employer's premises; and
4) whether it occurred during the hours of employment.
LeBrane, 292 So.2d at 218. The supreme court later clarified its position with regard to these factors, noting that not all four of the factors must be met before liability may be found. Miller v. Keating, 349 So.2d 265, 268-69 (La.1977).
In the instant case, the trial court noted, in written reasons for judgment, "A careful review of all of the facts fails to disclose any basis for Reynolds' liability under Civil Code Article 2320, as interpreted by Baumeister v. Plunkett and other jurisprudence, for the actions of Carl Anderson." We have thoroughly reviewed all of the evidence offered in support of, and in opposition to, the motion for summary judgment and conclude that the trial court was correct in finding no liability on the part of Reynolds.
We have analyzed the LeBrane factors in determining whether Reynolds can be held liable for Mr. Anderson's actions. Initially, we note that the last two LeBrane factors are easily met. It is undisputed that the alleged tortious conduct occurred during the course of employment. The record clearly establishes that Mr. Anderson's alleged sexual harassment and/or assault of Ms. Tanner occurred *898 while both Mr. Anderson and Ms. Tanner were on duty on Reynolds' premises.
The other two LeBrane factors are not as easily addressed. In determining whether Mr. Anderson's actions were "primarily employment rooted" and "reasonably incidental" to the performance of his employment duties, we must consider the totality of the facts and circumstances incident to his actions.
In Baumeister, the court determined that a hospital was not vicariously liable for the alleged sexual assault of a clinical technician that was committed by a nursing supervisor in the nurse's lounge of a hospital. The court noted that although the assault occurred on hospital's premises during working hours, the supervisor's "actions did not further [the hospital's] business and were not incidental to the performance of his supervisory duties, not even in a minor respect." The court concluded that the nursing supervisor's "sexual assault was entirely extraneous to his employer's interests." The court was careful to note, however, that not all sexual acts are of a personal nature and may sometimes be employment rooted. Baumeister, 95-2270 at 8-10, 673 So.2d at 999-1000.
In reaching this conclusion, the court was mindful of its previous decision in Ermert v. Hartford Insurance Co., 559 So.2d 467 (La.1990). In Ermert, the court noted:
The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service.
Ermert, 559 So.2d at 477 (citations omitted).
Under the specific facts of the case before us, it is clear that Mr. Anderson's actions did not further Reynolds' business. There remains, however, an issue as to whether Mr. Anderson's actions were incidental to the performance of his employment duties. Mr. Anderson was acting as a step-up supervisor at the time of the alleged harassment of Ms. Tanner. Ms. Tanner indicated that at the beginning of her shift, she was advised by Mr. Anderson to find him after she was finished with her initial job assignment so that he could assist her in loading the rail cars. According to the record, after Ms. Tanner went into the load-out shack to find Mr. Anderson, the actions by Mr. Anderson that ultimately culminated in the alleged sexual battery of Ms. Tanner began. The issue of whether Mr. Anderson's actions were reasonably incidental to the performance of his employment duties was a matter for the trier of fact to decide after a trial on the merits.
Thus, while we cannot state that based on Baumeister alone, summary judgment was appropriate in this case, we do find that based on La. Civ.Code art. 2320, the summary judgment granted in this case was warranted. According to Article 2320, responsibility for damage caused by an employee only attaches when the employer "might have prevented the act which caused the damage, and [has] not done it."
Ms. Tanner admitted in her deposition testimony that she never notified company officials that she was the subject of sexual harassment by Reynolds employees. In fact, it was not until the incident in question that Reynolds became aware of the alleged inappropriate behavior by Mr. Anderson and other Reynolds employees. The record is devoid of any evidence that Reynolds was aware of this situation prior to being notified by Ms. Tanner on September 23, 1996. Furthermore, Reynolds had a sexual harassment policy in place at the time. The policy was posted in several different places around the plant and set forth a specific procedure for reporting sexual harassment. Therefore, summary judgment dismissing Ms. Tanner's sexual *899 harassment claim against Reynolds was appropriate.
Ms. Tanner's claim against Reynolds is also based on La. R.S. 23:1006, Louisiana's anti-discrimination law. This statute prohibits intentional discrimination on the basis of race, color, religion, sex, disability, or national origin.[2] Louisiana's anti-discrimination law is similar in scope to the federal anti-discrimination prohibitions in Title VII of the Civil Rights Act of 1964. See 42 U.S.C. § 2000e, et seq. Thus, as noted by Ms. Tanner in brief, Louisiana courts have routinely looked to the federal statute for guidance in determining whether a claim for sexual harassment has been asserted.
There are two types of sexual harassment, one based on a quid pro quo theory and the other based on a theory of a hostile working environment. Meritor Savings Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986). It is apparent from the record that Ms. Tanner's claim was based on a hostile working environment. To prevail in a sexual harassment action based on a hostile working environment, the employee must assert and prove: (1) That she belongs to a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition or privilege of employment"; and (5) that the employer either knew or should have known of the harassment and failed to take prompt remedial action. DeAngelis v. El Paso Municipal Police Officers Association, 51 F.3d 591, 593 (5th Cir.1995), cert. denied, 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995).
Based on the undisputed facts in the record, the first four criteria listed above have been proven by Ms. Tanner. It is the final element that creates a problem in this case, i.e., whether Reynolds knew or should have known of the harassment in question and failed to take prompt remedial action. The issue becomes even more confused when considered in light of the recent United States Supreme Court decisions in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In Faragher and Burlington, the Supreme Court recognized that in cases where the alleged harasser is a supervisor, the final element set forth in DeAngelis need not be proven. Rather, when no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Faragher, 118 S.Ct. at 2293; Burlington, 118 S.Ct. at 2270.
The trial court found "no basis for any direct liability of Reynolds under R.S. 23:1006 and R.S. 51:2231." The court noted that "Ms. Tanner never told anyone in a supervisory capacity with Reynolds of what she now identifies as prior incidents of sexual harassment by other employees." The court further concluded that "once Reynolds became aware of Ms. Tanner's allegations against Mr. Anderson, it took immediate action to completely and properly investigate the matter." Based on our review of the record, we are satisfied that the trial court was correct in its findings. Our analysis follows.
In brief, Ms. Tanner asserts that the trial court found Mr. Anderson to be her supervisor at Reynolds. In written reasons for judgment, the trial court notes:

*900 [T]he Court accepts as true (for purposes of this Motion only) the version of the incident/incidents set forth by Plaintiff. Under that version of the facts (which is denied completely by Carl Anderson), Anderson made verbal and physical sexual advances to Ms. Tanner while the two of them were performing their assigned employment duties on the night of September 21-22, 1996. These advances allegedly culminated in two separate incidents of physical sexually-oriented battery on Ms. Tanner. At that time, Anderson was serving as a Step-Up Supervisor and was Ms. Tanner's direct supervisor on that shift.
While there is no specific finding by the trial court regarding Mr. Anderson's supervisory status, the trial court accepted, for the purposes of the motion for summary judgment, Ms. Tanner's version of the incident including the fact that Mr. Anderson was her direct supervisor on the shift in question. Likewise, we will assume for the purposes of this appeal that Mr. Anderson was acting in a supervisory capacity at the time of the alleged harassment, thus continuing our analysis of Ms. Tanner's claim based on the Supreme Court's ruling in Faragher and Burlington.
Initially, we note that Ms. Tanner suffered no tangible job detriment in this case. Therefore, the affirmative defense set forth by the Court in Faragher and Burlington is available to Reynolds.
A review of the record reveals that Reynolds clearly established the first part of the affirmative defense; i.e., that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." At the time of the incident in question, Reynolds had a sexual harassment policy in place. According to the human resource manager at Reynolds, the policy, which had been initiated in 1994, was posted in the main office, the employee lunchroom, and on plant bulletin boards. Mr. Anderson admitted in his deposition testimony that from the day he was hired, he was aware of the policy that sexual harassment was prohibited. The harassment policy provided the following procedure for reporting harassment: "An employee who is subjected to sexual harassment is strongly urged to promptly report such harassment or intimidation to his or her supervisor or the appropriate personnel official .... All such complaints or concerns will be treated in the strictest confidence and will be promptly investigated."
Ms. Tanner alleges in brief that she was discouraged from reporting sexual harassment. She asserts that she was told in her orientation by the personnel department that "some things were to be expected because [she] was going to working with men." According to Ms. Tanner, she was told that "it was a plant full of men" and that there would be "conversations that [she] was going to overhear" occurring "in the lunchroom and so forth." However, even if she was told this by the personnel department, this was not an instruction not to report sexual harassment. In fact, she acknowledges in her deposition that she was told by the same representative of the personnel department that if she had trouble, she could report it to him.
Once Ms. Tanner advised Reynolds about the alleged sexual harassment by Mr. Anderson, Reynolds immediately began a very thorough investigation of Ms. Tanner's complaints. The investigation ultimately resulted in Mr. Anderson's termination from Reynolds. Ms. Tanner was allowed to remain on paid leave during the investigation, and was asked to return to work after Mr. Anderson had been terminated from Reynolds and barred from the premises. Ms. Tanner remained on unpaid leave until her termination from Reynolds on April 1, 1998. Despite having been released by her treating physician to "return to full activity" as of January 1, 1998, Ms. Tanner refused to return to Reynolds claiming that she feared for her safety.
*901 The second part of the affirmative defense, i.e., that Ms. Tanner failed to take advantage of any preventive or corrective opportunities provided by Reynolds or to avoid harm otherwise, was also proven by Reynolds. Ms. Tanner has alleged that she was sexually harassed by several other Reynolds' employees prior to the incident involving Mr. Anderson. By her own admission, however, Ms. Tanner never complained to company officials at Reynolds about this alleged sexual harassment. It was only after the final encounter with Mr. Anderson on September 22, 1996, that she notified company officials of Mr. Anderson's inappropriate behavior. There is simply nothing in the record to support Ms. Tanner's assertion that Reynolds was aware of Mr. Anderson's "propensities against women at the plant." It was not until they were notified by Ms. Tanner about the incident that occurred on September 22, 1996, that Reynolds became aware of Ms. Tanner's situation, and promptly took corrective measures that led to Mr. Anderson's discharge. Thus, Reynolds has successfully proven, by a preponderance of the evidence, the affirmative defense afforded it by the Supreme Court in Faragher and Burlington, and cannot be held liable for the actions of Mr. Anderson.

DECREE
For the foregoing reasons, the judgment of the trial court granting summary judgment in favor of Reynolds is affirmed. Costs of this appeal are assessed against plaintiff/appellant, Randa B. Hall Tanner.
AFFIRMED.
FITZSIMMONS, J., concurs by GUIDRY, J.
NOTES
[1] Prior to the 1996 amendments of Article 966, jurisprudence held that summary procedure should be used cautiously and sparingly, and that any reasonable doubt should be resolved against mover and in favor of a trial on the merits. See Autin v. United Diesel, Inc., 95-1886, pp. 3-4 (La.App. 1 Cir. 4/30/96), 673 So.2d 316, 318.
[2] By virtue of La. Acts 1997, No. 1409, §§ 1 and 4, La. R.S. 23:1006 to 23:1008 were repealed and La. R.S. 23:331 to 23:334 were enacted relating to discrimination in employment on account of race, color, religion, sex, disability, or national origin.