**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-30044

LORI SMITH,

Plaintiff-Appellant,

versus

AMEDISYS INC.; PROMOD SETH;
MITCHELL MOREL; WILLIAM BORNE,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Louisiana

July 26, 2002

Before JONES, EMILIO M. GARZA, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Lori Smith ("Smith") appeals the district court's grant of summary judgment for her former employer and three former supervisors on her claims under Title VII, Louisiana employment discrimination statutes, and Louisiana tort law. For the reasons that follow, we affirm the decision of the district court.

FACTUAL AND PROCEDURAL BACKGROUND

Smith was employed by Amedisys, Inc. ("Amedisys") from October 20, 1995 through September 28, 1996. Smith alleges that during her employment with Amedisys, she was subjected to sexual harassment by Chief Operations Officer Promod Seth ("Seth"), who was her immediate supervisor, Chief Financial Officer Mitchell Morel ("Morel"), and Chief Executive Officer William Borne ("Borne") (collectively "individual Defendants"). Because the district court disposed of this case by way of summary judgment, we state the facts in the light most favorable to Smith.

Seth was flirtatious with Smith at the office and would put his arm around her in front of other employees. Seth requested to have dinner and drinks with Smith on numerous occasions, he would touch her hands at dinner, he would repeatedly touch her leg and hold her hand when she would drive him to work or to appointments. Smith would immediately take Seth's hand off her leg, pull her hand back, and tell him not to hold her hand because it was inappropriate and it made her feel uncomfortable. Further, there were several business trips that Smith and Seth took together where he would make sexual advances toward her. On one business trip, Seth came to Smith's hotel room under the guise of watching television and, while he was there, grabbed her hand and pulled her to the bed next to him, kissing, holding, and touching her and saying that he wanted her to lay down and watch television with him. She told him no, pushed him away, squirmed away from him, and asked him to leave several times before he finally complied with her requests. Seth also told Smith to wear shorter skirts, low cut blouses, tighter fitting clothing, and high heels to improve sales for Amedisys. For example, in a meeting involving a physician recruitment project, Seth said that he wanted "good looking women" wearing "short skirts" to go on appointments with the doctors and told the

2

employees, including Smith, "whatever [they] had to do to get the contract signed, get them signed and it didn't matter."

Morel was also present at that particular physician recruitment meeting and agreed with everything that Seth said. Further, Morel made repeated comments about Smith's clothing and her physical appearance, as well as the appearances of other women. On Smith's first day at work, Morel told her that he was glad to see a "good looking" woman in the sales position because the previous woman in Smith's position was "tall and she had bleached blond hair and she was real thin and wrinkly." Additionally, Morel always commented about who Smith was previously and currently dating, made sexually oriented comments about how Smith obtained certain contracts and business, commented about her sex life, and repeatedly suggested that she prostitute herself in order to obtain business for the company. Borne also made sexually oriented and offensive comments about other women's appearances, involving their sizes, shapes, height, weight, faces, and hair; the type of women he found attractive; and "what turned him on."

On September 27, 1996, Borne called Smith into his office and told her that he had received reports from a client that she was making derogatory statements regarding Amedisys and Borne. Cindy Doll ("Doll"), the Head of Human Resources, was also present at this meeting. Smith was permitted to resign, in lieu of termination. Smith's letter of resignation was dated September 30, 1996. Smith entered into a separation agreement with Amedisys ("Separation Agreement"), dated November 12, 1996, in which she released "AMEDISYS of any and all employment related claims."

On September 3, 1997, Smith sued Amedisys and the individual Defendants in Louisiana state court, alleging claims arising under Louisiana employment discrimination statutes and Louisiana tort law. Specifically, she alleged sexual harassment, discrimination, retaliation, and intentional infliction

of emotional distress. On February 2, 1998, the state court denied an exception of no right and no cause of action that sought to dismiss Smith's claims against the individual Defendants in their individual capacities relating to their liability under Louisiana employment discrimination law. Seth then filed a third-party demand against Agricultural Excess and Surplus Insurance Company ("Agricultural Excess") for indemnity, defense costs, statutory penalties, and attorneys fees. The parties engaged in discovery, the matter was scheduled for trial in state court on September 30, 1999, and a pretrial order was filed on July 12, 1999.

Amedisys and the individual Defendants removed the case to the Middle District of Louisiana following Smith's amendment of her petition on August 6, 1999 to add claims under Title VII, 42 U.S.C. § 2000e et seq.. Smith then filed a motion to remand, seeking remand of the action under 28 U.S.C. § 1447 based upon procedural defects, or alternatively, remand of all or part of her claims under 28 U.S.C. § 1441(c). This motion was denied. On October 26, 1999, Smith filed a supplemental and amending complaint. Subsequently, Amedisys and the individual Defendants filed motions for summary judgment, the matter was reassigned to the Eastern District of Louisiana, and the parties consented to proceed before a magistrate judge. By order entered on August 4, 2000, the trial court granted the summary judgment motions and dismissed all of Smith's claims against Amedisys and the individual Defendants. The trial court concluded that Smith (1) could not pursue the individual Defendants, in either their individual or official capacities, under Title VII or Louisiana employment discrimination statutes, LA. REV. STAT ANN. §§ 23:1006, 51:2231 et seq.; (2) released her claims against Amedisys under Title VII and Louisiana employment discrimination statutes; and (3) failed to establish a genuine issue of material fact concerning her intentional infliction of emotional distress claims. Following settlement of all remaining claims by and between Seth, Amedisys, and

4

Agricultural Excess, a formal judgment was entered by the trial court on December 21, 2000, dismissing all of Smith's claims and the indemnification claims.

DISCUSSION

I.

Smith first challenges the trial court's refusal to remand the entire case or her state law claims under the discretionary provision of 28 U.S.C. § 1441(c).[1] We review the trial court's refusal to remand under 28 U.S.C. § 1441(c) for an abuse of discretion. Anderson v. Red River Waterway Comm'n, 231 F.3d 211, 214 (5th Cir. 2000).

Under § 1441(c), whenever a "separate and independent claim or cause of action" that is based on federal-question jurisdiction is "joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates." 28 U.S.C. § 1441(c). "Thus, for remand to be proper, the claim remanded must be (1) a separate and independent claim or cause of action; (2) joined with a federal question; (3) otherwise non-removable; and (4) a matter in which state law predominates." Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320, 327 (5th Cir. 1998). Because it found that Smith's federal claims were not "separate and independent" from her state law claims, the trial court refused to remand the entire action or her state law claims.

"[W]here there is a single wrong to [the] plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under

---

[1]Smith also suggested for the first time at oral argument that there was a procedural defect in the initial removal. Because Smith failed to brief this issue, she has waived this argument. See Am. Nat'l Gen. Ins. Co. v. Ryan, 274 F.3d 319, 325 n.3 (5th Cir. 2001).

§ 1441." Id. (quoting Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 14 (1951)) (internal quotations omitted). "A case involving the violation of a single primary right or wherein a party seeks redress for one legal wrong cannot contain separate and independent claims, despite multiple theories of liability against multiple defendants." Texas v. Walker, 142 F.3d 813, 817 (5th Cir. 1998). Moreover, "[w]e have held that a claim is not independent if it involves substantially the same facts." Eastus v. Blue Bell Creameries, L.P., 97 F.3d 100, 104 (5th Cir. 1996) (quoting Addison v. Gulf Coast Contracting Servs., 744 F.2d 494, 500 (5th Cir. 1984)) (internal quotations omitted).

All of Smith's claims, state and federal, are seeking redress for Smith's allegations that the individual Defendants sexually harassed her, discriminated against her, and retaliated against her during her employment with Amedisys. Both Title VII and Louisiana employment discrimination statutes prohibit sexual harassment, discrimination, and retaliation, and Louisiana courts routinely look to federal law for guidance in determining whether a viable claim has been asserted. E.g., Wyerick v. Bayou Steel Corp., 887 F.2d 1271, 1274 (5th Cir. 1989); McMillon v. Corridan, No. 97-3981, 1998 WL 560334, at *3 (E.D. La. Aug. 31, 1998); Tanner v. Reynolds Metals Co., 739 So. 2d 893, 899 (La. Ct. App. 1999). Thus, the proof required by Smith on the federal and state employment discrimination claims will involve "substantially the same facts." Further, Smith's intentional infliction of emotional distress claim is based on the "outrageous" behavior–i.e., the alleged verbal and physical harassment–of the individual Defendants. For the federal claims and state law claims in the instant case, the single wrong is the sexual harassment, discrimination, and retaliation allegedly committed by the individual Defendants, and the various claims are simply different theories of recovery.

As a result, the federal claims and the state law claims are not "separate and independent claim[s] or cause[s] of action" under § 1441(c). Thus, the trial court correctly concluded that it was without discretion to remand.

## II.

We now turn to the trial court's determination on the merits. A grant of summary judgment is reviewed *de novo*. Geoscan, Inc. of Tx. v. Geotrace Techs., Inc., 226 F.3d 387, 390 (5th Cir. 2000). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. Geoscan, 226 F.3d at 390. We must view the facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. Id. Questions of law are reviewed *de novo*. Mowbray v. Cameron County, Tex., 274 F.3d 269, 278 (5th Cir. 2001).

## A.

On appeal, Smith argues that the trial court erroneously granted summary judgment on her claims against Amedisys under Title VII and Louisiana employment discrimination statutes. Thus, we must address the trial court's finding that the Separation Agreement was valid and that Smith released Amedisys from her claims under Title VII and Louisiana employment discrimination statutes.[2] Because we find that the Separation Agreement is binding regarding Smith's Title VII and

---

[2] In light of the trial court's determination that the individual Defendants were not liable under Title VII or Louisiana employment discrimination statutes, the court did not address their alternative arguments that the Separation Agreement released them from liability.

7

Louisiana employment discrimination claims, we conclude that the trial court correctly granted Amedisys summary judgment on these claims.

1.

"A general release of Title VII claims does not ordinarily violate public policy. To the contrary, public policy favors voluntary settlement of employment discrimination claims brought under Title VII." Roger v. Gen. Elec. Co., 781 F.2d 452, 454 (5th Cir. 1986) (citations omitted). Nonetheless, we must closely scrutinize a release waiving rights under Title VII because of their remedial nature. See Watkins v. Scott Paper Co., 530 F.2d 1159, 1172 (5th Cir. 1976) ("A waiver of a federal remedial right is not lightly to be inferred.").

The interpretation and validity of a release of claims under Title VII is governed by federal law. Williams v. Phillips Petroleum Co., 23 F.3d 930, 935 (5th Cir. 1994); Roger, 781 F.2d at 454. A release of a Title VII claim is valid only if it is "knowing and voluntary." Roger, 781 F.2d at 454. In determining whether a release was knowingly and voluntarily executed, this court has adopted a "totality of the circumstances" approach. See O'Hare v. Global Natural Res., 898 F.2d 1015, 1017 (5th Cir. 1990). The employer bears the burden of establishing that its former employee "signed a release that addresses the claims at issue, received adequate consideration, and breached the release." Williams, 23 F.3d at 935. It is then incumbent upon the former employee to "demonstrat[e] that the release was invalid because of fraud, duress, material mistake, or some other defense." Id. To determine whether the former employee has met the burden of establishing a defense to the validity of the release, we examine the following relevant factors:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of [the] plaintiff in deciding the terms of the agreement, (4) the clarity of the

8

agreement, (5) whether the plaintiff was represented by or consulted with an attorney, and (6) whether consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

O'Hare, 898 F.2d at 1017.

It is undisputed that Smith signed a release dated November 12, 1996. The language of the Separation Agreement read, in pertinent part, as follows:

> This separation agreement and general release is made and entered into by and between Lori Smith and AMEDISYS, Inc. and/or its subsidiaries (hereafter referred to as AMEDISYS). In consideration of your agreement to abide by the below listed issues, AMEDISYS agrees to continue your salary for a period of two (2) months following your resignation on September 28, 1996. You will receive your salary on the 22nd and 7th of each month, beginning October 22, 1996 and ending on December 7, 1996.
>
> The issues referenced above are as follows:
> . . . .
> 2.     You agree to release AMEDISYS of any and all employment related claims.
> . . . .
> 6.     AMEDISYS agrees to provide favorable work related references in response to any future inquiries.

The trial court found that the language of the release unambiguously covered Smith's Title VII claim. Title VII is the centerpiece of federal employment discrimination law. Only "employers" as defined in Title VII are prohibited from discriminating against individuals with respect to their "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Thus, the relationship between the plaintiff and defendant in a Title VII action must be one of "employment." As the trial court recognized, but for Smith's status as an employee of Amedisys, she would have no Title VII claim. Paragraph 2 of the Separation agreement states that Smith agreed to release Amedisys "of any and all employment related claims." This provision unambiguously covers Smith's Title VII claim, which is clearly "employment related."

9

The trial court also rejected Smith's argument that the release was invalid for lack of consideration. Smith's argument runs as follows. At the September 27th meeting where Borne asked for her resignation, he orally promised to give her two months of severance pay in exchange for her resignation, before any release was mentioned. Smith then tendered her resignation. Further, Smith claims that she received her severance pay before she even received the Separation Agreement. In exchange for the Separation Agreement, Smith allegedly received the severance pay to which she was already entitled by virtue of Borne's promise and her resignation. Thus, she argues that no consideration supports the release because Smith received from Amedisys no more than an amount of money to which she already had a right. We agree with the trial court that Smith's argument fails upon an examination of the summary judgment evidence.

During her deposition, Smith testified that at the September 27th meeting, Borne asked her to resign in exchange for a two-month severance package, she agreed because she needed severance pay, and Borne said that "he didn't want any derogatory comments to clients" and that "all [she] needed to do was write a resignation letter." Borne stated at his deposition that the two months of severance pay came up at the September 27th meeting because he wanted to give Smith severance "so she could get back on her feet." Doll also testified at her deposition that Borne told Smith that he would give her the opportunity to resign, said that he would be fair to her in the event that she did resign, and offered her two months of severance pay at the meeting. Doll testified that the Separation Agreement was drafted and sent to Smith within days after the September 27th meeting and that she received Smith's resignation letter within days of the meeting. Doll also testified that the Separation Agreement was sent to Smith before the first paycheck following Smith's resignation was sent, but that the first paycheck was sent even though they had not received the signed Separation Agreement

10

from Smith. Smith testified, however, that she received the four payments specified in the Separation Agreement only after she signed it.

The Separation Agreement states that "[i]n consideration of your agreement to abide by the below listed issues, AMEDISYS agrees to continue your salary for a period of two (2) months following your resignation on September 28, 1996" and that Amedisys further "agrees to provide favorable work related references in response to any future inquiries." At Smith's deposition, she testified that she understood that she would receive two months salary in exchange for signing the Separation Agreement. Further, Smith stated that she was told that she could not receive any severance payments until she signed the Separation Agreement. Although Doll's testimony suggests that Smith may have received one payment prior to signing the Separation Agreement, Smith's own testimony was that she received the four payments specified in the Separation Agreement only after signing it. Smith also testified that she accepted payment from Amedisys in keeping with the Separation Agreement. Thus, Smith received consideration in exchange for signing the Separation Agreement.[3]

---

[3]At most, Smith's right to receive two months of severance pay prior to signing the Separation Agreement was disputable. See Warnebold v. Union Pac. R.R., 963 F.2d 222, 224 (8th Cir. 1992) (holding that an employee received consideration for his release of an Age Discrimination in Employment Act (ADEA) claim when he received severance payments where he had only a contested right to benefits prior to signing the release); see also Joe v. First Bank Sys., Inc., 202 F.3d 1067, 1071 (8th Cir. 2000) (holding that an employee received consideration for his release of a Worker Adjustment and Retraining Notification Act claim when he received severance benefits, notwithstanding his contention that he was entitled to severance benefits prior to signing the release, where the employer had the right to condition payment of benefits on employee signing release); O'Hare, 898 F.2d at 1017 (holding that the release of an ADEA claim was supported by consideration where the employee "gave up a disputed right to [severance] benefits . . . for an undisputed right to a smaller package of benefits."); O'Shea v. Commercial Credit Corp., 930 F.2d 358, 362 & n.3 (4th Cir. 1991) (holding that the release of an ADEA claim was supported by consideration where the employee received severance payments to which she was not unquestionably entitled).

11

Smith brought a Title VII claim against Amedisys, which is a matter addressed in the Separation Agreement. Thus, Amedisys has met its initial of burden of proof regarding Smith's waiver of her Title VII claims.

Smith does not assert that the Separation Agreement was obtained by fraud or duress. She does contend, however, that genuine issues of material fact exist as to whether the release was knowing and voluntary. Smith claims that the release is invalid because the Separation Agreement did not mention "Title VII" or "federal claims." This argument is meritless. This Court has recognized that "[i]n determining whether a release was knowingly and voluntarily executed, federal law requires that a valid waiver is not to be 'lightly inferred.' " Roger, 781 F.2d at 454. There is no obligation, however, under Title VII or federal common law, that a release must specify Title VII or federal causes of action to constitute a valid release of a Title VII claim. See Stroman v. W. Coast Grocery Co., 884 F.2d 458, 461 (9th Cir. 1989) (holding that a release "need not specifically recite [Title VII] in order to be effective"); Pilon v. Univ. of Minn., 710 F.2d 466, 467-68 (8th Cir. 1983) (holding that even though a general release of "any and all" claims did not specifically mention Title VII, "the wording of the release in the present case is clear and leaves no doubt that all claims potentially held by Pilon are waived"); see also Int'l Ass'n of Machinists & Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V., 199 F.3d 796, 798 (5th Cir. 2000) (Worker Adjustment and Retraining Notification Act); Williams, 23 F.3d at 935 (same).

Moreover, contrary to Smith's contention, we agree with the trial court that an analysis of the totality of the circumstances demonstrates that Smith has not raised a genuine issue of material fact as to whether she knowingly and voluntarily executed the release. First, Smith admits that she is a high school graduate, she completed a business administration course at a business college, and she

12

took a couple of semesters of accounting classes at Louisiana State University. Smith read every word of the Separation Agreement before signing it and although she testified that she did not understand that Paragraph 2 would release her claims in this lawsuit, she could not explain why she did not understand it or what she understood it to mean at the time. Second, Smith's testimony concerning the amount of time that she had possession of the Separation Agreement before signing it is conflicting. In her first deposition she stated that she had it in her possession for approximately four weeks, but in her second deposition she testified that she sent it back to Amedisys the same day she received it. Either way, Smith was given no deadline for signing the Separation Agreement; she was merely told that she would not receive her severance payments until she signed it and sent it back to Amedisys. Third, Smith's job with Amedisys included negotiating contracts with physicians. She testified that she understood Paragraph 3, which contained a noncompetition clause, and struck that paragraph from the Separation Agreement prior to signing it. Fourth, the Separation Agreement was a one-page document that stated in plain and simple language that it "release[d] AMEDISYS of any and all employment related claims." This quoted language is not verbose "legalese" and is easily understood to cover Smith's Title VII claim. Fifth, Smith chose not to consult an attorney, even though she had ample time to do so.[4] Finally, the severance payments and Amedisys's agreement to give her favorable references were benefits to which Smith was not already entitled. Thus, summary judgment was appropriate on Smith's Title VII claim against Amedisys.

2.

---

[4]Although Smith did not consult an attorney prior to executing the Separation Agreement, this circumstance does not require us to find that the release was not knowing and voluntary. See Williams, 23 F.3d at 937; Rogers, 781 F.2d at 456 & n.7.

Under Louisiana law, a release is known as a "transaction or compromise."[5] The elements

of a compromise are: "(1) mutual intention of putting an end to the litigation, and (2) reciprocal

concession of the parties in adjustment of their differences." Brown v. Drillers, Inc., 630 So. 2d 741,

747 n.8 (La. 1994). The burden of establishing the requisites for a compromise, including that it

covers the claims asserted, falls on the employer. Id. at 747-48. The burden of proving that a

compromise is invalid is on the employee attacking the instrument. Id. at 747.

A compromise is a written contract that "must be interpreted according to the parties' true

intent [and] is governed by the same general rules of construction applicable to contracts." Id. at 748.

Louisiana Civil Code article 2046 sets forth a general rule that "[w]hen the words of a contract are

clear and explicit and lead to no absurd consequences, no further interpretation may be made in

search of the parties' intent." Brown, 630 So. 2d at 748. Louisiana Civil Code article 3073 contains

a supplementary rule of construction governing the scope of a compromise. Id. It provides as

follows:

> Transactions regulate only the differences which appear clearly to be comprehended
> in them by the intention of the parties, whether it be explained in a general or
> particular manner, unless it be the necessary consequence of what is expressed; and
> they do not extend to differences which the parties never intended to include in them.

LA. CIV. CODE ANN. art. 3073 (West 1994).

Proof of the scope of a release "can include reference to extrinsic evidence because, even

though Louisiana courts generally interpret a contract from within its four corners, they 'have crafted

_____

[5] Louisiana Civil Code article 3071 states that "[a] transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing." LA. CIV. CODE ANN. art. 3071 (West 1994).

14

a special exception to the extrinsic evidence rule for compromise agreements.' " Copeland v. Wasserstein, Perella & Co., Inc., 278 F.3d 472, 480-81 (5th Cir. 2002) (quoting Brown, 630 So. 2d at 748). "Importantly, as the language of article 3073 suggests, if the releasor 'did not intend to release certain aspects' of a claim, extrinsic evidence is admissible to establish 'whether unequivocal language in the instrument was intended to be unequivocal.' " Id. at 481 (quoting Brown, 630 So. 2d at 749). Louisiana courts, however, have limited this extrinsic evidence exception "to cases in which substantiating evidence is presented establishing either (1) that the releasor was mistaken as to what he or she was signing, even though fraud was not present; or (2) that the releasor did not fully understand the nature of the rights being released or that the releasor did not intend to release certain aspects of his or her claim." Brown, 630 So. 2d at 749. Thus, "[w]hen . . . a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and thus summary judgment is appropriate." Id. at 749-50.

The issue presented here is whether the Separation Agreement reflects that the parties clearly comprehended a release of claims under Louisiana employment discrimination statutes. Because the parties dispute the scope of the Separation Agreement, extrinsic evidence would ordinarily be considered. The extrinsic evidence exception, however, is inapplicable here. Amedisys relies solely on the language of the Settlement Agreement and Smith has not presented substantiating evidence that she was mistaken as to what she was signing, that she misunderstood the rights being released,

15

or that she did not intend to release certain aspects of her claim.[6]  Thus, our interpretation of the parties' intent will be governed by the four corners of the Separation Agreement.

An analysis of the four factors set forth in article 3073 leads us to determine that the Separation Agreement covers Smith's claims under Louisiana employment discrimination statutes. The Separation Agreement is couched in general terms, releasing "any and all employment related claims."  Webster's Third International Dictionary defines "claim" as "a demand of a right or supposed right . . . a calling on another for something due or supposed to be due."  WEBSTER'S THIRD INTERNATIONAL DICTIONARY 414 (3d ed. unabridged 1968).  Black's Law Dictionary defines "claim" as including "[a]n interest or remedy recognized at law" or a "cause of action."  BLACK'S LAW DICTIONARY 240 (7th ed. 1999).  When modified by "employment related," the causes of action which Smith waived were limited.  This limitation could be either narrowly construed to mean that cause of action itself must sound in employment law, or broadly construed to mean that the cause of action must arise out of Smith's employment with Amedisys.  Under either construction, this general release is sufficient to clearly express the parties' intent that the Separation Agreement cover Smith's claims, which arise from workplace occurrences and are based on Louisiana's statutes designed to remedy discrimination in the workplace.

Further the second requirement that there be reciprocal concessions of the parties is present in this case.  As previously discussed, Smith received consideration for signing the Separation Agreement.  "*Consideration*, in the common-law sense, is not a prerequisite for a valid contract in Louisiana."  Unkel v. Unkel, 699 So. 2d 472, 475 (La. Ct. App. 1997).  Louisiana's Civil Code

---

[6]Smith merely testified, without further explanation, that she did not understand the meaning of Paragraph 2.

requires only "cause," not "consideration." LA. CIV. CODE ANN. art. 1967 ("Cause is the reason why a party obligates himself."); Id. cmt.(c) ("Under this article, 'cause' is not 'consideration.' The reason why a party binds himself need not be to obtain something in return or to secure an advantage for himself."). "A transaction and compromise requires no other *cause* than an adjustment of differences and avoidance of litigation, the *cause* prescribed by article 3071." Unkel, 699 So. 2d at 475. The Separation Agreement clearly evidences reciprocal concessions by the parties. Smith's primary concession as cause for the Separation Agreement was the release of "any and all employment related claims," while Amedisys's concession as cause for the agreement was the payment of two months of salary and the undertaking of an obligation to provide favorable references. Therefore, the trial court properly granted summary judgment in favor of Amedisys on Smith's claims under Louisiana employment discrimination statutes.

B.

In light of our conclusion that the trial court correctly granted summary in favor of Amedisys on Smith's Title VII claims, we must next address Smith's challenge to the trial court's election to exercise supplemental jurisdiction over Smith's state law claims under 28 U.S.C. § 1367 after dismissing all of Smith's federal claims.[7]

After dismissing Smith's Title VII claims, the trial court appropriately considered whether it could properly exercise supplemental jurisdiction over Smith's remaining state law claims. Concluding that Smith's state law claims did not involve novel or complex issues of law, that extensive discovery had been completed and the case had been pending for almost three years, that

---

[7]Smith does not appeal the trial court's grant of summary judgment in favor of the individual Defendants on Smith's Title VII claims against them in their individual and official capacities.

the parties had exhaustively briefed the issues in the case, and that the court was intimately familiar with the merits of Smith's claims, the trial court held that retaining the state law claims was appropriate. Smith argues that her state law claims predominate, that virtually all discovery was conducted at the state level, that the case was close to trial in state court, and the state court was equally if not more familiar with the case

The trial court's decision to retain jurisdiction over pendent state law claims is reviewed for abuse of discretion. McClelland v. Gronwaldt, 155 F.3d 507, 519 (5th Cir. 1998). Our review is guided by "both the statutory provisions of 28 U.S.C. § 1367(c) and the balance of the relevant factors of judicial economy, convenience, fairness, and comity." Batiste v. Island Records, Inc., 179 F.3d 217, 227 (1999). "Although we have stated that our 'general rule' is to decline to exercise jurisdiction over pendent state-law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial, this rule is neither mandatory nor absolute." Id.

We review the trial court's decision beginning with the factors enumerated in 28 U.S.C. § 1367(c).[8] Regarding the first factor, the remaining claims do not involve any "novel or complex" issues of state law. Considering the second and third factors, our analysis above affirms the trial court's dismissal of the only federal claims alleged. Thus, the state law claims now predominate over

---

[8]28 U.S.C. § 1367(c) provides that
> [t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if–
> > (1) the claim raises a novel or complex issue of State law,
> > (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> > (3) the district court has dismissed all claims over which it has original jurisdiction, or
> > (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

the nonexistent federal claims. Turning to the fourth factor, we find no "exceptional circumstances" for refusing to retain jurisdiction. Thus, our § 1367(c) analysis results in the conclusion that two factors weigh toward retaining jurisdiction over the remaining claims, and two factors point toward declining jurisdiction.

We next consider the factors of judicial economy, convenience, fairness, and comity. The instant case has been pending for almost three years, the parties have taken numerous depositions, and the matter had progressed to the advanced stages of litigation with little left to do before trial. Further, as the trial court noted, it "devoted many hours to reviewing [the parties'] memoranda, the attached exhibits and the record in this case; researching the legal issues involved; and reaching the decisions" in its comprehensive summary judgment ruling. Thus, the trial court had "substantial familiarity with the merits of the case." Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 587 (5th Cir. 1992); see also Batiste, 179 F.3d at 228 ("The familiarity of the district court with the merits of the Batistes' claims demonstrates that further proceedings in the district court would prevent redundancy and conserve scarce judicial resources . . . ."). We therefore determine that the principles of judicial economy, convenience, and fairness to the parties weigh heavily toward retaining jurisdiction.

After balancing all of the factors in this case, we conclude that the trial court did not abuse its discretion in exercising supplemental jurisdiction over Smith's remaining state law claims.

C.

Smith next contends that the trial court erred by granting summary judgment on her claims against the individual Defendants under Louisiana employment discrimination statutes because the state court previously ruled that the individual Defendants could be liable under Louisiana

19

employment discrimination statutes as they existed in 1996. She argues that since this state court ruling became the "law of the case," the trial court was bound to follow the state court ruling. We disagree.

The trial court concluded that the individual Defendants could not be held liable to Smith because they were not "employers" under the two Louisiana statutes prohibiting sexual harassment, discrimination, and retaliation that were in effect in 1996, while Smith worked at Amedisys: Louisiana Revised Statute § 23:1006[9] and the Louisiana Commission on Human Rights Act (LCHRA), LA. REV. STAT. ANN. § 51:2231 et seq. Even assuming that the state court ruled that Smith had a cause of action against the individual Defendants under both Louisiana employment discrimination statutes,[10] we hold that the trial court properly disregarded the state court ruling because the individual Defendants are not "employers" under either statute and, therefore, cannot be liable.[11]

Louisiana Revised Statute § 23:1006 defines "employer" as "a person, association, legal or commercial entity . . . receiving services from an individual and in return giving compensation of any kind to said individual and who employs more than fifteen employees." LA. REV. STAT. ANN. § 23:1006. It is undisputed that Smith performed services for Amedisys and received compensation

---

[9]LA. REV. STAT. ANN. § 23:1006 was repealed by Acts 1997, No. 1209, effective August 1, 1997.

[10]The state court's ruling is not contained in the record. Thus, we are unable to ascertain whether the state court decided that there was a cause of action under Louisiana Revised Statute § 23:1006, the LCHRA, or both statutes.

[11]Cf. Copeland v. Merril Lynch & Co., Inc., 47 F.3d 1415, 1424 (5th Cir. 1995) ("[T]he law of the case doctrine is a discretionary rule of practice which does not limit the power of the court to revisit a legal issue [and] permits a change of position when it appears that the original ruling in the case was wrong."); 18 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4478, at 798 & n.29 (2d ed. 1981) (explaining that a federal court may show deference "to rulings made by a state court in an action that is subsequently removed to a federal court," but that "[t]he sense of deference . . . should not amount to a feeling of compulsion").

20

from Amedisys; Smith neither performed services for nor received compensation from the individual Defendants. Since the individual Defendants were not Smith's "employer" as defined under § 23:1006, Smith has no claim under this statute against them. See, e.g., Hornsby v. Enterprise Transp. Co., 987 F. Supp. 512, 515 (M.D. La. 1997).

The LCHRA defines "employer" as "any person employing eight or more persons within the state, or any person acting as an agent of an employer." LA. REV. STAT. ANN. § 51:2232(4).[12]  Smith asserts that the state court concluded that the LCHRA afforded her a cause of action against the individual Defendants because they were "agents" of Amedisys.

Louisiana courts and federal courts applying Louisiana law have routinely looked to federal jurisprudence to interpret Louisiana employment discrimination statutes. E.g., Nichols v. Lewis Grocer, 138 F.3d 563, 566 (5th Cir. 1998); Fishel v. Farley, No. 93-480, 1994 WL 90325, at *2 (E.D. La. Mar. 16, 1994); King v. Phelps Dunbar, L.L.P., 743 So. 2d 181, 187 (La. 1999). Under Title VII, an "employer" includes any "person engaged in an industry affecting commerce . . . and any agent of such a person." 42 U.S.C. § 2000e(b).  This circuit  has held that there is no individual liability for employees under Title VII. See Indest v. Freeman Decorating, Inc., 164 F.3d 258, 262 (5th Cir. 1999); Grant v. Lone Star Co., 21 F.3d 649, 652 (5th Cir. 1994). While Title VII's definition of the term employer includes "any agent" of an employer, Congress's purpose was merely to import *respondeat superior* liability into Title VII. See Indest, 164 F.3d 258 at 262; Grant, 21 F.3d 649 at 652 (citing Miller v. Maxwell's Int'l, Inc., 991 F.2d 583, 587 (9th Cir. 1993)). Further, a plaintiff is not entitled to maintain a Title VII action against both an employer and its agent in an

---

[12]LA. REV. STAT. ANN. § 51:2232(4) was repealed by Acts 1997, No. 1209, effective August 1, 1997.

official capacity. See Indest, 164 F.3d at 262. Under the reasoning of our case law interpreting Title VII, the individual Defendants cannot be liable to Smith in their individual or official capacities under the LCHRA. See, e.g., Rhyce v. Martin, 173 F. Supp. 2d 521, 534 (E.D. La. 2001).

Thus, we conclude that the trial court correctly departed from the state court's prior ruling and granted summary judgment in favor of the individual Defendants, in their individual and official capacities, on Smith's claims under § 23:1006 and the LCHRA.[13]

D.

Smith also argues that the trial court erroneously granted summary judgment in favor of Amedisys and the individual Defendants on her intentional infliction of emotional distress claims against them. We disagree.[14]

Under Louisiana law, in order to recover for intentional infliction of emotional distress, a plaintiff is required to establish three elements: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." White v. Monsanto Co., 585 So. 2d 1205, 1209 (La. 1991). "Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." Id. at 1210. The trial court determined that Smith's

---

[13]Because we affirm the trial court's conclusion with regard to the individual Defendants' liability under Louisiana employment discrimination statutes, and Smith did not appeal its similar conclusion regarding Title VII, we need not address whether the Separation Agreement released the individual Defendants from liability under Title VII or Louisiana employment discrimination statutes.

[14]We assume arguendo that Smith's release of claims against Amedisys did not cover the claim for intentional infliction of emotional distress.

22

claim for intentional infliction of emotional distress failed as a matter of law because she failed to produce sufficient evidence to show that the mental anguish suffered by Smith rises to the level of severe distress required to support such a claim. The second prong of the <u>White</u> test requires that "[t]he distress suffered must be such that no reasonable person could be expected to endure it. Liability arises only where the mental anguish or suffering is extreme." <u>Id.</u> at 1209. We conclude that the district court correctly determined that Smith failed to put forth evidence to establish a genuine issue of material fact concerning the second prong of <u>White</u>.

Smith testified that she felt angry, embarrassed, disgusted, humiliated, horrified, and repulsed when Seth made physical and verbal sexual advances toward her. She believed that the sexually oriented statements made by Morel were "disgusting" and she felt "belittled" and "embarrassed" by Morel's comments, which made her feel as though she was only hired to work for Amedisys because of her appearance, as opposed to her intelligence and experience. She found Borne's comments about women and African-Americans "repulsive," "horrible," and "very offending." Being asked to resign from her job "was devast ating" to Smith and she "wasn't happy," "was very disgusted and disappointed," and "was mad [and] very depressed."

As of April 26, 1999, the day that Smith's second deposition was taken, Smith testified that she was still depressed and angry, she thought about losing her job at Amedisys every day, and it affected her current job. The loss of her job "discourage[d]" Smith, made her feel "incompetent," and made her wonder if she is "even doing a good job now." The individual Defendants' behavior and her experience at Amedisys caused her to be "embarrassed of [her] appearance" and altered the manner in which she approaches her current job.

Smith testified that she suffered from depression, headaches, and loss of appetite in the spring of 1997, for which she saw a family practitioner, Dr. Gerald Barber, and a neurologist, Dr. Carolyn Baker. Smith claims that she related the history of what happened at Amedisys to Dr. Baker. A CAT scan was performed on Smith and she received medication for her headaches. The results of the CAT scan were negative, but the neurologist's nurse suggested to Smith that the headaches could be stress-related.

Dr. Baker testified that she examined Smith once on February 21, 1997 and that Smith complained of headaches. Dr. Baker said that she prescribed medication for Smith's headaches. When asked whether Smith told Dr. Baker about any prior sexual harassment, Dr. Baker responded: "I didn't, we didn't make any notes to that effect. I don't remember that. I have to say no." Dr. Baker also stated that there was nothing in her records which documented Smith telling her of problems which could have caused stress headaches. Further, Dr. Baker explained that "[i]f the patient said to me that she had been under stress, . . . we would have probably written that down."

Although the conduct alleged by Smith involved persistent verbal and physical sexual harassment, and has Smith shown that she experienced emotional distress as a result of this harassment and losing her job at Amedisys, the evidence does not show that the distress was "unendurable." White, 585 So. 2d at 1209; see also RESTATEMENT (SECOND) OF TORTS § 46 cmt. j ("Emotional distress . . . includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. . . . The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it."). We are constrained by White and the Louisiana cases construing the severity prong of the White test. While there is no

24

bright-line test for determining whether Smith's emotional distress meets the level of severity necessary to make Amedisys and the individual Defendants liable, from our review of Louisiana law, it is evident that the threshold is high. Smith has not cited, and our research has not revealed, Louisiana cases that have lowered the threshold to the point where the emotional distress described by Smith would satisfy the severity prong. Accordingly, we affirm that the trial court's grant of summary judgment in favor of Amedisys and the individual Defendants on Smith's intentional infliction of emotional distress claims.

E.

Finally, Smith claims that the trial court erred by entering judgment dismissing all of her claims against Amedisys and the individual Defendants without considering what she asserts are state law claims of battery against Seth and Amedisys, based on *respondeat superior*. We are not persuaded by this argument because we conclude that, to the extent that Smith's supplemental and amending complaint can be construed to assert battery claims, Smith has abandoned those claims.

"The notice pleading requirements of Federal Rule of Civil Procedure 8 and case law do not require an inordinate amount of detail or precision." St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 434 (5th Cir. 2000). "The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim." Id. (citation and internal quotations omitted). Smith's complaint focused on violations of Title VII and Louisiana employment discrimination statutes and intentional infliction of emotional distress purportedly committed by Amedisys and the individual Defendants. In describing those violations, however, Smith generally alleged that she was subjected to Seth kissing her and touching her legs suddenly and unexpectedly, for which she sought relief. Although Smith's complaint did not

25

specifically include the word "battery," such a claim could come within those allegations and those allegations state facts upon which relief can be granted.[15]

In National Ass'n of Government Employees v. City Public Service Board of San Antonio, Texas, we reiterated that because "trial courts will not rule on claims–buried in pleadings–that go unpressed before the court," this Court may construe parties' failure to urge their claims before the trial court as an intent to abandon those claims. 40 F.3d 698, 705 (5th Cir. 1994) (quoting Vaughn v. Mobil Oil Exploration & Producing Southeast, Inc., 891 F.2d 1195, 1198 (5th Cir. 1990)). While recognizing that "this maxim pertains to a determination [of] whether a judgment is final for the purposes of appeal," we have found it applicable in other contexts. Baran v. Port of Beaumont Navigation Dist. of Jefferson County Tex., 57 F.3d 436, 441 (5th Cir. 1995) (declining to remand a meritless issue to the district court where the parties urging the issue on appeal failed to develop and argue it fully in that court). Similarly, we find that this principle supports our conclusion that Smith cannot belatedly resurrect a purported claim that she completely failed to pursue before the trial court.

We note that Amedisys and the individual Defendants moved for summary judgment, as opposed to partial summary judgment, on *all* of Smith's claims against them, but did not address battery claims. The status report filed by Smith on December 9, 1999, after Amedisys, Morel, and Borne moved for summary judgment, does not identify battery claims. Smith's responses to the defendants' motions for summary judgment do not mention battery claims. The trial court's order entered on August 4, 2000 makes no reference to battery claims in its description of Smith's suit and

---

[15]Under Louisiana law, the intentional tort of battery is "a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such contact." Caudle v. Betts, 512 So. 2d 389, 391 (La. 1987).

states as follows: "IT IS ORDERED that the defendants' motions for summary judgment are GRANTED and that *all* of plaintiff's claims against them are DISMISSED WITH PREJUDICE. The only remaining claim in this lawsuit is Seth's third-party demand against Agricultural Excess . . . ." Smith never suggested to the trial court that she had battery claims, or any other claims, that were not fully disposed of by the trial court's grant of summary judgment. Thus, it appears that neither the parties nor the trial court believed there to be a live battery claim when judgment was entered on December 21, 2000, dismissing Smith's complaint. Further, Smith made no post-judgment motions and only brought up her battery claims on appeal.

Considering the circumstances surrounding this case, we conclude that any battery claims were abandoned. Thus, the trial court's dismissal of Smith's complaint without considering her abandoned battery claims was not erroneous.

### CONCLUSION

For the foregoing reasons, we AFFIRM the trial court's grant of summary judgment in favor of Amedisys and the individual Defendants.

AFFIRMED.