# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 26, 2010

No. 09-41004

Lyle W. Cayce
Clerk

ROBERT PACKARD, D.M.D., M.S.; PACKARD ORTHODONTICS PA, doing business as Apple Orthodontix,

Plaintiffs - Appellees

v.

OCA INC, formerly known as Orthodontic Centers of America, Inc.; ORTHODONTIC CENTERS OF TEXAS, INC.,

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Texas

Before CLEMENT, SOUTHWICK, and HAYNES, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Appellants OCA, Inc. and Orthodontic Centers of Texas, Inc. (collectively, "OCA") appeal the district court's grant of summary judgment in favor of Robert Packard, D.M.D., M.S. and Packard Orthodontics, P.A., doing business as Apple Orthodontix (collectively, "Packard") on its counterclaims for unjust enrichment and money had and received. The district court ruled, as a matter of Texas law, OCA could not pursue its equitable counterclaims to recover benefits conferred pursuant to the illegal contract. We AFFIRM.

No. 09-41004

## FACTS AND PROCEEDINGS

This appeal arises out of an illegal business relationship between a corporation from Delaware and a dentist from Texas. The facts underlying this relationship are complicated, but largely undisputed.

Dr. Packard, his former partner, and their professional corporation entered into a long-term service agreement with Apple Orthodontix, Inc. ("Apple"). Apple provided "practice management services" to orthodontic practices in seventeen states before filing for bankruptcy in 2000. With the bankruptcy court's blessing, Apple sold some of its assets, including the Packard–Apple contract, to OCA. Shortly thereafter, Packard and OCA entered into several agreements. OCA paid to Packard almost five million dollars in exchange for, among other things and relevant here, the entry into a long-term management services agreement that superseded the Packard–Apple contract. This new agreement, the Business Services Agreement ("BSA"), included a twenty-five year term for which OCA would provide Packard with business and administrative support and services.[1] The BSA also called for OCA to develop up to seven new offices with Packard, with OCA agreeing to advance Packard the money needed to develop the new offices.

Five years into the BSA, Packard terminated the BSA and sued for a declaratory judgment that the Packard–OCA agreements were illegal, and therefore void. OCA counterclaimed for breach of contract, conversion, unjust

---

[1] These services included employment, scheduling, and training of non-licensed office staff; provision and maintenance of the offices, telephones, utilities, furniture, fixtures, and equipment; bookkeeping and accounting services; billing and collection services; administration and disbursement of funds; installation of computer hardware and software, and training staff; ordering and management of supplies and inventory; preparation of statistical data and analyses of operations; legal services for routine operations; consulting advice on efficiency and productivity, marketing, office locations and set-ups, and staff salaries, benefits, and performance and incentive plans, as requested; marketing and advertising services; and all other business services reasonably required for routine business operations.

enrichment, promissory estoppel, money had and received, account stated, declaratory judgments that the contracts were legal, breach of warranty and indemnity, and attorney's fees. OCA introduced evidence that it had paid Packard approximately $4,992,674.00 in up-front affiliation payments and advances, and argued that—taking into account the sums Packard paid OCA during the five years of the BSA—Packard retained a net benefit of approximately $2,279,275.00. Packard moved for summary judgment as to the illegality of contract.

The district court then stayed the proceedings pending the outcome of a related appeal to this court that required us to pass on the legality of OCA's standard contracts. In December 2008, this court declared OCA's standard contracts illegal under Texas law, concluding that the agreements allowed OCA to engage in the unlicensed practice of dentistry. *In re OCA, Inc.,* 552 F.3d 413, 424 (5th Cir. 2008) (holding "the subject matter of the [BSA] runs afoul of [Texas Occupations Code] section 251.003(a)(4)'s prohibition of unlicensed persons from owning, operating, or maintaining a premises at which those persons also employ or engage another person to practice dentistry."). The district court then lifted its stay of the proceedings in this case.

OCA conceded the illegality of the agreements, leaving its equitable counterclaims as the only remaining issues for resolution. Packard moved for summary judgment as to the counterclaims, and the district court referred the matter to a magistrate judge for preparation of a report and recommendation ("R&R"). The magistrate judge reasoned that, under Texas law, the general rule is that a court will not assist parties to an illegal contract. Recognizing several narrow exceptions to the general rule, the magistrate judge concluded that no evidence supported the application of any exceptions, and recommended that

No. 09-41004

summary judgment be granted in favor of Packard on OCA's counterclaims.[2] The district court adopted the amended report and recommendation over OCA's objections.  OCA timely appealed as to its counterclaims for unjust enrichment and money had and received. OCA does not appeal the district court's grant of summary judgment on the illegality of the contract or the remaining counterclaims.

## DISCUSSION

### A.    Standard of Review

"We review a grant of summary judgment de novo and apply the same legal standard as the district court." *Maverick Recording Co. v. Harper*, 598 F.3d 193, 195 (5th Cir. 2010). Summary judgment should be rendered if the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). "For the purposes of a summary judgment determination, all fact questions are viewed in the light most favorable to the nonmovant." *Aucoin v. Haney,* 306 F.3d 268, 271 (5th Cir. 2002).

Because this court's jurisdiction is predicated on the federal diversity statute, Texas substantive law governs this dispute. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  In determining questions of Texas law, this court looks to the decisions of the Texas Supreme Court, which are

---

[2] In its briefing, OCA highlights a "procedural irregularity" that occurred prior to the district court's decision. The magistrate judge initially issued a R&R recommending that the district court grant Packard's motion, but apparently relied on a clearly erroneous reading of the record in so doing. OCA highlighted the magistrate judge's error in its objections to the R&R to the district court. Before the district court ruled on OCA's objections, the magistrate judge withdrew, *sua sponte*, his initial R&R and submitted an amended R&R that reached the same conclusion without relying on the erroneous facts. OCA exercised its right to raise objections to the amended R&R, and those objections were considered and ultimately overruled by the district court. OCA's argument—or observation—as to the "procedural irregularity" does not affect this court's jurisdiction and OCA does not assert that it was deprived of due process as a result of the substitution.

binding. *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565 (5th Cir. 2005). The decisions of Texas intermediate appellate courts may provide guidance, but are not controlling. *Id.* If the Texas Supreme Court has not ruled on the controlling legal question in this appeal, this court "must determine, to the best of its ability, what the highest court of the state would do." *Id.* at 566.

## B.   Illegal Contracts Under Texas Law

The general rule under Texas law is that "no accounting or recovery of profits can be had by one party to an illegal transaction against another." *Lewis v. Davis*, 199 S.W.2d 146, 150 (Tex. 1947) (quotations omitted); *see also Beer v. Landman*, 31 S.W. 805, 806 (Tex. 1895) ("[N]either a court of law nor a court of equity will aid either [party to an illegal transaction] to recover or reinvest himself with any title or interest which he, in consideration of such unlawful contract, has vested in the other, but will leave them in the same condition as to vested interests as they, by their own acts, have placed themselves."). This rule springs from a judicial "unwillingness to afford the matter an initial examination [which] flows from the failure of the illegal contract to confer upon the parties rights to be examined and determined by a court . . . and from a refusal to aid a plaintiff who stands *in pari delicto* with the defendant." *Burks v. State*, 795 S.W.2d 913, 914 (Tex. App.–Amarillo 1990, pet. ref'd) (citing *Ewell v. Daggs,* 108 U.S. 143, 147–50 (1883)).

Texas law recognizes limited exceptions to the general prohibition. First, "[a] test, sometimes used in determining whether a demand connected with an illegal transaction can be enforced, is whether the plaintiff requires any aid from the illegal transaction to establish his case." *Lewis,* 199 S.W.2d at 151. Second, an illegal contract will not preclude recovery if the parties are not *in pari delicto*. *Graham v. Dean*, 188 S.W.2d 372, 373 (Tex. 1945) ("The rule that a court will not entertain a suit growing out of an illegal transaction is not always applicable

where the parties are not *in pari delicto*.").  Finally, "even where the parties are *in pari delicto* relief will sometimes be granted if public policy demands it." *Lewis*, 199 S.W.2d at 151. In reaching that decision, the question "often involved" is "wheteher (sic) the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other. The solution of the question depends upon the peculiar facts and the equities of the case, and the answer usually given is that which it is thought will better serve public policy." *Id.*

It is undisputed that the Packard–OCA contract is illegal, *see In re OCA,* 552 F.3d at 424, and therefore triggers the general prohibition against recovery. We turn then to whether OCA should be afforded relief according to one of the aforementioned exceptions.

1.     *Whether OCA Can Establish a Right to Recover Independent of the Illegal Transaction*

Texas law distinguishes between a party who must rely on an illegal contract to establish his right to recover and a party that merely needs to incidentally refer to an illegal contract to explain the transaction, allowing the latter to recover. *See, e.g., Beer,* 31 S.W. at 807 ("The plaintiff can not recover when it is necessary for him to prove, as a part of his cause of action, his own illegal contract, or other illegal transaction; but if he can show a complete cause of action without being obliged to prove his own illegal act, although such illegal act may incidentally appear, and may be important even as explanatory of other facts in the case, he may recover."). We hold that OCA cannot invoke this exception because the calculation of any recovery would require proof as to each party's satisfaction of the illegal agreement over a period of several years—thus requiring far more than the incidental reference permitted under Texas law.

A brief review of Texas cases allowing parties to an illegal contract to recover under this exception is instructive. *Norman v. B. V. Christie & Co.*

involved two contracts—a contract between two venturers, B.V. Christie (Christie) and Norman, and a contract between Christie and a Water District. 363 S.W.2d 175, 176 (Tex. Civ. App.—Houston 1962, writ ref'd n.r.e.). Under the Christie–District contract, Christie purchased bonds from the District at a discount and later resold them. *Id. This* contract was later held to be illegal; the District sued Christie and won a judgment against him. *Id.* Christie then sued Norman, seeking contribution based on the Texas rule that "one partner paying a firm debt has a right to contribution from the other members of the partnership." *Id.* at 176–77. Norman defended the suit by arguing the general rule of Texas law that courts deny relief to parties to illegal contracts and should leave the parties where they found them. *Id.* at 177. The court allowed Christie to recover in contribution against Norman, holding that proof of the illegal Christie–District contract was not required for Christie to establish its cause of action based on the legal Christie–Norman contract. *Id.* at 178.[3]

OCA finds support for its position in *City of Denton v. Municipal Administrative Services, Inc.*, 59 S.W.3d 764, 770 (Tex. App.—Fort Worth 2001). In *City of Denton,* the city engaged MAS, an auditing firm, to conduct an audit of the city's contract with a telephone company. *Id.* at 766–67. Under the arrangement, MAS was paid fifty percent of underpayments by the telephone company discovered by the audit and recovered by the city. *Id.* On appeal, the court found the contract "illegal," and therefore void, because it had been entered into in violation of a state statute that "regulate[d] how municipalities are to contract for various types of professional services." *Id.* at 767. As a result, *City of Denton* held "because the trial court should have held the contract void, it should

---

[3] In *Morrison v. City of Fort Worth*, an illegal contract between a firefighter and the city of Fort Worth did not bar a fireman's widow from recovering wages due her deceased husband. 155 S.W.2d 908, 909–10 (Tex. 1941). The "illegal contract constitute[d] no bar to the plaintiff's cause of action" in *Morrison* because the plaintiff sought "recovery *under a mandatory State statute,*" not the illegal contract. *Id.* (emphasis added).

No. 09-41004

have entered judgment for a refund of the fees paid by Denton to MAS." *Id*. at 770. By "restoring the parties to their precontractual positions," *City of Denton* permitted the City a rescissory recovery. *See* BLACK'S LAW DICTIONARY 1420 (9th ed. 2009). We find *City of Denton* unpersuasive, as did the district court, because it "appears to be an anomaly."[4] *Packard v. OCA, Inc.,* No. 4:05CV273, 2009 WL 3172106, at *3 (E.D. Tex. Sept. 29, 2009).

Texas courts have allowed parties to recover monies paid pursuant to illegal contracts where the illegal act has not been consummated. *Compare Lewy v. Crawford*, 23 S.W. 1041, 1042 (Tex. Civ. App. 1893) (allowing party to an illegal gaming contract to recover from the third-party stakeholder[5] holding the wagers, even after the "happening of the contingency upon which the wager is suspended," so long "as the money is in the hands of the stakeholder") *with Beer,* 31 S.W. at 806 (refusing to allow party to an illegal contract to "recover or reinvest himself with any title or interest which he, in consideration of such unlawful contract, has vested in the other"); *see also Principles Governing Recovery by Parties to Illegal Contracts*, 26 HARV. L. REV. 738, 739 (1912) ("At least if the illegality is not of a serious nature, either party may rescind *while the illegal act is still unperformed*.") (emphasis added).

Where only payment has been made, but no other performance under the illegal contract has been rendered, the plaintiff can establish his right to recover without relying on the illegal contract—the court need not examine the contract, its terms, or the value of any services performed under the contract. In *Lewy*, for

---

[4] "[T]he general rule [is] that where a party sues to recover money paid under a void instrument, *he cannot seek rescission*, but must recover in Quantum valebant for money had and received." *Country Cupboard, Inc. v. Texstar Corp.*, 570 S.W.2d 70, 74 (Tex. Civ. App.– Dallas 1978) (emphasis added). Although *City of Denton* cites *Country Cupboard*, by allowing the City a rescissory remedy, it misapplies the rule of that case.

[5] In this context, a stakeholder is "[o]ne who holds the money or valuables bet by others in a wager." BLACK'S LAW DICTIONARY 1535 (9th ed. 2009).

example, a group of men illegally wagered on the outcome of a gubernatorial election in violation of a Texas penal statute, placing their wagers with Lewy, a stakeholder. *Lewy*, 23 S.W. at 1041. After the election, one of the gamblers, Crawford, notified Lewy to not pay his bet over to another gambler, but instead directed Lewy to return his wager to him. *Id.* Lewy refused to return the money to Crawford, but at the time of suit had "never paid the money over to any one, but still had it." *Id.* The court in *Lewy* recognized the general rule against permitting parties to an illegal contract to invoke the aid of the courts, and noted "[t]he terms of the bet, or who was winner or loser, can cut no figure in the decision of this case." *Id.* Where the stakeholder still retained the illegal bet, however, the court allowed Crawford to disaffirm his illegal act and have the money returned to him. *Id.* at 1042. Critical was the fact that Crawford "does not rely on the illegal contract to establish his right to the money, but he says that appellant Lewy has his money on deposit, and he wants it." *Id.* at 1044. The court distinguished, however, a case where the wagered money has been paid from the stakeholder to the winner, stating that in such cases "it can not be recovered from stakeholder or winner." *Id.* at 1043 (quotations omitted). In these situations, where the illegal act has been consummated, the loser is forced to rely on the illegal contract to establish his right to recover. A court can no longer treat the loser's wager as a "deposit" and allow him to repudiate the contract and recover the deposit—the money has vested in the winner by virtue of the illegal contract and the loser is forced to rely upon the illegal contract to establish why the winner has money belonging to him.[6] *See, e.g., Beer,* 31 S.W. at 806.

---

[6] The reason courts allow a plaintiff to recover what he has paid under an illegal contract *before* any other act occurs is "that the plaintiff's claim is not to enforce, but to repudiate, an illegal agreement . . . In such case, there is a locus penitentiae; the wrong is not consummated, and the contract may be rescinded by either party." *Bernard v. Taylor*, 23 Ore. 416, 422 (1893); *see also Taylor v. Bowers*, [1875-76] 1 Q.B.D. 295 ("Under these circumstances . . . . [t]he action is not founded upon the illegal agreement, nor brought to enforce it, but, on the contrary, the plaintiff has repudiated the [illegal] agreement, and his action is founded on

No. 09-41004

In this appeal, OCA asserts that it paid almost five million dollars in affiliation payments and advances to Packard, and that Packard retained over $2.2 million after taking into account the sums paid under the contract. Packard contends that it paid over six million dollars to OCA during the life of the illegal contract.[7] It is undisputed that OCA paid the five million dollars in affiliation payments and advances to Packard in consideration for, among other things, the entry into the management services contract that this court held to be illegal in *In re OCA.* OCA has made no showing that any portion of its payments to Packard were for any purpose other than entry into the illegal contract. Indeed, the Affiliation and Stock Purchase Agreement ("ASPA") between the parties is specifically conditioned on, among other requirements, the parties' entry into the "OCA/Packard Service Agreement." The parties' dispute as to the amounts paid by Packard to OCA during the life of the illegal contract highlights the impossibility of OCA proving its cause of action without relying on the illegal contract. A factual determination of the disputed amounts paid under the contract would necessarily require the district court to determine which payments were valid under the illegal contract and which were not—by examining every transaction made under the illegal agreement. In essence, the district court would be required to legitimize certain transactions as "valid" under the illegal contract, and thus creditable as an offset of the affiliation payments made by OCA to Packard. This the court cannot do.[8] There is simply no way for

_____

that repudiation.").

[7] In light of our disposition of this case, the dispute over the precise amounts paid by each party is irrelevant.

[8] We acknowledge that a case where one party repudiates an illegal contract immediately upon the commencement of performance presents a different and more troubling application of this rule. That would be different case and might produce a different result. Here, however, OCA enjoyed the benefits of its affiliation payment for several years and nothing in the record suggests Packard knowingly drew OCA into an illegal contract with the purpose of securing a windfall. As a result, we need not address that more difficult question.

No. 09-41004

OCA to establish its right to recover independent of the illegal contract. This case is not remotely like *Norman v. B.V. Christie* or *Morrison v. City of Fort Worth.* This is not a case where OCA's "demand is in some way connected with an illegal transaction" and where OCA "requires no aid from the illegal transaction to establish his case." *Morrison* ,155 S.W.2d at 910.

We agree with the district court that, under these facts, any recovery by OCA would be intertwined with the illegal contract and hold that the first exception to the general prohibition against recovery by parties to an illegal contract is inapplicable in this case.

2.    *Whether the Parties are* In Pari Delicto

"Texas courts recognize that where parties to an illegal contract are not *in pari delicto*, the party least culpable may recover." *Villanueva v. Gonzalez*, 123 S.W.3d 461, 467 (Tex. App.—San Antonio 2003). The district court concluded that "there is no summary judgment evidence here to show that OCA was any less culpable than Packard." *Packard,* 2009 WL 3172106, at \*4. We agree.

In *Bateman Eichler, Hill Richards, Inc. v. Berner*, the Supreme Court addressed the contours of the *in pari delicto* doctrine. 472 U.S. 299, 310 (1985); *see also Rogers v. McDorman*, 521 F.3d 381, 390 (5th Cir. 2008) ("*Bateman Eichler* went beyond merely establishing when *in pari delicto* is available; the Court also addressed the defense's substantive content."). The Court explained that the *in pari delicto* doctrine applies to bar a private action for damages in the securities context "only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman Eichler*, 472 U.S. at 310–11.

Courts have traditionally applied the *in pari delicto* doctrine to allow plaintiffs who engaged in illegal acts to recover when:

11

No. 09-41004

> One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offence.

1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE 300 (1886). Texas courts have applied the exception "where one party is unaware of the true facts and believes the contract is lawful, the general rule that an illegal contract is unenforceable does not apply." *Int'l Bank of Comm. v. Int'l Energy Dev. Corp.*, 981 S.W.2d 38, 52 (Tex. App.—Corpus Christi 1998).

The relevant issue is whether there is any genuine issue of material fact as to whether OCA and Packard do not bear "substantially equal responsibility" for the illegal contract, such that they are not *in pari delicto*. Specifically, the critical issue is the relative culpability of the parties as to the illegal contract. OCA sets forth two arguments in support of its claim that it is not *in pari delicto* with Packard: (1) that OCA subjectively believed that the contract was legal; and (2) that Packard, as a licensed dentist, had a heightened obligation under the Texas Administrative Code to prevent the unlicensed practice of dentistry.

As to OCA's first argument, the district court properly noted that "there has been no showing, and none is alleged, that Packard had knowledge of peculiar facts not known to OCA. Both parties were aware of the facts surrounding the entering of the contract." *Packard,* 2009 WL 3172106, at *3. While "[r]elief from the effect of an illegal contract has been given in some cases to a party induced to enter the contract by means of fraud or undue influence," *Sherrard v. After Hours, Inc.*, 464 S.W.2d 87, 90 (Tex. 1971), even assuming, *arguendo*, that Packard knew of the illegality of the contract prior to entry and OCA did not, OCA does not allege that Packard concealed that knowledge from it or induced it into entering into the contract. Indeed, it appears from the record that both parties were sophisticated entities that entered into an illegal

No. 09-41004

agreement that inured to each of their benefit. Moreover, "[s]ince every man is presumed to know the law, [OCA] had no right to assume that the contract [with Packard] was legal." Recent Cases,  11 TEX. L. REV. 114, 128 (1932) (citing *Nystel v. Gully,* 257 S.W. 286 (Tex. Civ. App. 1921)).

As to Packard's alleged violation of the Texas Administrative Code section requiring dentists to prevent the unauthorized practice of dentistry,  OCA argues that "the Packard Contract would have never been consummated if Packard had simply followed the proscriptions [the code] mandated."[9] We find this argument unpersuasive. First, this argument is vitiated by OCA's *own* conduct in connection with the illegal contract, which arguably constitutes a felony under Texas law. *See* TEX. OCC. CODE ANN. § 256.001 ("A person may not practice or offer to practice dentistry or dental surgery or represent that the person practices dentistry unless the person holds a license issued by the board."); TEX. OCC. CODE ANN. § 264.151(a) ("A person commits an offense if the person violates Section

---

[9] In relevant part, the administrative code states:

A licensed dentist shall conduct his practice on the highest plane of honesty, integrity, and fair dealing. In order to safeguard the dental health and welfare of the public and the dentist-patient relationship and fix professional responsibility for dental services, no dentist or any other licensee or certificate holder of the Board shall:

. . .

(4) permit or allow himself, his practice of dentistry, his professional identification, or his services to be used or made use of, directly or indirectly, or in any manner whatsoever, so as to create or tend to create the opportunity for the unauthorized or unlawful practice of dentistry by any person, firm, or corporation or for the practice of dentistry in violation of any provision of the Texas Dental Practice Act or any rule, regulation, or order of the Board;

22 TEX. ADMIN. CODE § 108.1 (2010).

256.001. An offense under this subsection is a felony of the third degree. Each day of a violation is a separate offense.").

Next, "[w]here the contract is illegal because of statutory prohibition, the plaintiff is not *in pari delicto* if the statute *is for his protection*." Recent Cases, 11 TEX. L. REV. at 129 (emphasis added). The prefatory language contained in the Texas Administrative Code section OCA relies upon makes clear that the statute is designed to protect *the public from* the illegal practice of dentistry, not corporations who engage *in* the illegal practice of dentistry. *See* 22 TEX. ADMIN. CODE § 108.1 ("In order to safeguard the dental health and welfare of the public and the dentist-patient relationship and fix professional responsibility for dental services, no dentist or any other licensee or certificate holder of the Board shall . . . ."). *Cf. Am. Nat'l Ins. Co. v. Tabor*, 230 S.W. 397, 399–400 (1921) (insured allowed to recover as not *in pari delicto* with insurer upon contract that was illegal due to violation of a statute designed to protect insured).

In *Plumlee v. Paddock*, Plumlee, an owner of an ambulance company, entered into an illegal referral contract with a law firm. 832 S.W.2d 757, 758 (Tex. App.—Fort Worth 1992). Plumlee sought equitable relief on the illegal contract and argued that the law firm partners' violation of a heightened duty to prevent the unauthorized practice of law, applicable to them and not him under Texas' rules of professional conduct for attorneys, warranted such relief. *Id.* at 759–60. The court rejected Plumlee's argument and denied him equitable relief, in part because the "principal reasons" for the provision were "to prevent solicitation by lay persons of clients for lawyers and to avoid encouraging or assisting nonlawyers in the practice of law." *Id.* at 60. As did the court in *Plumlee*, we "fail to see how [OCA] believes this court can afford him relief" based upon this argument, *id.,* which would allow a wrongdoer who engaged in the illegal practice of dentistry to invoke the protections of a statute *specifically*

14

*designed* to protect the public from that illegal practice. This is nonsensical and would directly contradict the purpose of the statute.

As a matter of law, OCA and Packard bear "substantially equal responsibility" for the illegal contract and are therefore *in pari delicto*. We hold that the second exception to the general prohibition against recovery by parties to an illegal contract is inapplicable in this case.

3.      *Whether Public Policy Demands Relief for OCA*

"[E]ven where the parties are *in pari delicto* relief will sometimes be granted if public policy demands it." *Lewis*, 199 S.W.2d at 151. Determining whether "the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment . . . depends upon the peculiar facts and the equities of the case, and the answer usually given is that which it is thought will better serve public policy." *Id*. "[I]t is not the purpose of this rule of law to benefit or punish either of the parties . . . ." *Norman,* 363 S.W.2d at 178.

"It is true that as between parties in pari delicto relief will be granted if public policy demands it. In such cases the guilt of the respective parties is not considered by the court, which looks only to the higher right of the public; the guilty party to whom relief is granted being only the instrument by which the public is served. The relief is granted to discourage such transactions by others." *Wright v. Wight & Wight,* 229 S.W. 881, 882 (Tex. Civ. App. 1921). The focus of the public policy exception to the rule general prohibiting recovery by parties to illegal contracts is properly on the *public's* interest, not the parties'. We therefore look to whether the "higher right of the public" will be best served by allowing OCA to recover and ask whether such relief would "discourage such transactions by others." *Id*.

OCA asserts that three factors weigh in favor of allowing it relief based upon the public policy exception: (1) Packard's heightened duty under the Texas Administrative Code; (2) Packard's status as a wrongdoer; and (3) the fact OCA

acquired its interest in the Packard contract pursuant to an order of the bankruptcy court. We find these reasons unpersuasive.

The "higher public right" at the center of this case is the public's interest in the prevention of the unlicensed practice of dentistry. Indeed, the very reason this contract was deemed illegal is because its terms allowed OCA to engage in the illegal practice of dentistry. *In re OCA*, 552 F.3d at 423–24. OCA fails to explain how the public interest of preventing the unlicensed practice of dentistry is best served by allowing it, a corporation that engaged in the unlicensed practice of dentistry, to recover monies it paid in order to do so. We have previously disposed of OCA's argument as to Packard's heightened duty under the Texas Administrative Code. That Packard is also a fellow wrongdoer and may have violated his duties as a dentist during the course of the OCA–Packard relationship is of no consequence to determining whether the *public's* interest would be furthered in allowing OCA to recover. Nor is OCA's argument as to the bankruptcy court's alleged approval of the contract persuasive. The record reflects that OCA acquired an interest in the Apple–Packard contract pursuant to the bankruptcy court's June 1, 2000 order. The BSA found illegal by this court in *In re OCA* was entered into by the parties on September 29, 2000. The BSA is altogether separate from the bankruptcy proceedings, having been entered into post-bankruptcy for the purposes of *superseding* the Apple–Packard contract. Even assuming, *arguendo*, that OCA is correct that "the Bankruptcy Judge believed the contract to be legal," the bankruptcy court could only have opined on the *Apple*–Packard contract before it, and not the *OCA*–Packard that was not entered into for another five months.

Allowing OCA to recover might provide a disincentive for dentists to enter into these types of affiliation agreements, thereby "discouraging such transactions by others." *Wright*, 229 S.W. at 882. But the risk of "such transactions by others" has already been significantly diminished by *In re OCA,*

which declared these types of affiliation arrangements to be illegal under Texas law. Underscoring this point is OCA's repeated insistence that it believed the Packard–OCA contract to be legal when it entered into the agreement. After *In re OCA*, there is little risk that future sophisticated parties like Packard and OCA will harbor allegedly erroneous subjective beliefs as to the legality of affiliation agreements between dentists and corporations. Furthermore, any disincentive to future dentists must be counterbalanced against the increased incentives to future corporations if OCA is allowed to recover. A corporation like OCA would be far more likely to enter into potentially illegal agreements if it could be confident that courts would "aid [it] to recover or reinvest [it] with any title or interest which [it], in consideration of such unlawful contract, has vested" in its business partner. *Beer,* 31 S.W. at 806. We cannot say that allowing OCA to recover would discourage future transactions by others.

Finally, the public policy exception to the general prohibition requires us to determine whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment. We note that the "wrong" here is the unlicensed practice of dentistry. Under the "peculiar facts and equities of the case," we find a situation in which one of two parties, *in pari delicto* and substantially equally guilty of the wrong, has allegedly been unjustly enriched at the expense of the other. We hold that allowing that party, OCA, to recover from Packard would not serve the "higher public right" by discouraging future illegal arrangements like the one before us. Therefore, we cannot say that "public policy demands [OCA's recovery]." *Lewis*, 199 S.W.2d at 151. We agree with the district court that this exception is inapplicable. We are cognizant that this holding may permit Packard to be unjustly enriched at OCA's expense,[10] but hold that the policy against permitting unjust enrichment does not outweigh the policy

---

[10] Although we are not entirely certain, given the unresolved dispute as to the amounts paid by Packard to OCA during the life of the illegal contract.

No. 09-41004

against courts assisting a wrongdoer based upon the peculiar facts and equities of this case.

## CONCLUSION

The judgment of the district court is AFFIRMED.