# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 31, 2012

No. 11-10788

Lyle W. Cayce
Clerk

MATTHEW J. SCHIRLE,

Plaintiff–Appellant

v.

SOKUDO USA, L.L.C.; DNS ELECTRONICS L.L.C.; DAINIPPON SCREEN DEUTSCHLAND GMBH; DAINIPPON SCREEN MANUFACTURING COMPANY LIMITED,

Defendants–Appellees

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 4:08-CV-555

Before KING, PRADO, and HAYNES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:[*]

Plaintiff–Appellant Matthew Schirle brought various claims related to his employment against a family of Japanese semiconductor companies—Defendants–Appellees Dainippon Screen Manufacturing Company, Ltd. ("DSM"), DNS Electronics, LLC ("DNSE"), Dainippon Screen Deutschland gMBh ("DSD"), and Sokudo USA, LLC ("Sokudo USA"), collectively the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-10788

Appellees.  Specifically, he claimed that he was defamed, discriminated against based on his non-Japanese origin, and retaliated against when he complained of the discrimination.  The district court granted summary judgment to the Appellees.  Because fact issues exist as to Schirle's employment claims, we REVERSE that grant in part but AFFIRM as to Schirle's defamation claims.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In 1996, Schirle began working for DNSE.[1]  After working his way up through the ranks of DNSE, Schirle was seconded by DNSE to Sokudo USA in July 2006.  While seconded to Sokudo USA, Schirle served as Sokudo USA's president and in that capacity reported to Takashige Suetake, chief executive officer of Sokudo KK and vice chairman of DSM.  Schirle alleges that in December 2006 he began to experience harassment motivated by a cultural bias against "gaijins," or foreigners not of Japanese descent.  In late March 2007, Suetake removed Schirle's sales responsibilities for the European market and transferred them to Akihiko Okamoto. In mid-August 2007, following a late July 2007 diagnosis of generalized anxiety disorder by Dr. Robert DeMartini, Schirle took a two-month medical leave from Sokudo USA.  Though the parties disagree as to whether Schirle left of his own accord or was fired, in September 2007, Schirle ended his employment with the DSM family of companies.

Throughout his time at Sokudo USA, Schirle made several complaints about "gaijin" harassment to various individuals within Sokudo USA and DNSE. Schirle first complained of the discrimination in mid-February 2007; he informed Suetake that he was being harassed by Steve Yada and Marty Yano, who like Schirle were DNSE employees seconded to Sokudo USA.  Yada and Yano's job responsibilities were to oversee Schirle and other American managers.  Schirle

---

[1] In terms of the relationship between the defendant entities, DNSE and DSD are subsidiaries of DSM. Sokudo USA is a wholly-owed subsidiary of non-party Sokudo KK, which itself is a joint venture between DSM and another non-party, Applied Materials.

No. 11-10788

again complained of harassment in May 2007. This time he did so to DNSE Human Resources Director Alan Bickett. On July 12, 2007, Schirle reported the continuing harassment to Nancie Dunn, another DNSE HR employee. Finally, on August 13, 2007, Schirle filed a formal complaint with Bickett alleging "gaijin" discrimination by Suetake, Yada, Yano, and Keisuke Takimoto, a DSM employee who Suetake appointed in late June 2007 to directly supervise Schirle.

Schirle also alleged that various individuals defamed him during his secondment to Sokudo USA. He detailed five instances.

A. On July 18, 2007, during an executive review meeting with representatives of Micron Technology, Takimoto (1) displayed an organization chart that misspelled Schirle's name and cast ambiguity on his position, (2) indicated that Schirle was a secretary and not a manager, and (3) indicated that Schirle could be eliminated if Micron desired.

B. On October 19, 2007, in response to an inquiry by Will Henrich (an employee of a DSD third-party agent in Germany) about whether Schirle had left voluntarily, DSD President Junji Otsuka wrote: "I heard he's suffering from small mental disease, and not appearing to Sokudo USA office at all in this one month time."

C. In late 2007, DNSE Vice President of Business Operations Scott Galler discussed Schirle's "mental issues" with Reggie Hernandez, a Sokudo USA account manager. Galler (1) shared the information in Otsuka's email with Hernandez, (2) informed Hernandez that Schirle suffered from "mental issues," (3) indicated that these mental issues were related to Schirle's departure from Sokudo USA, and (4) told Hernandez that Schirle had inherited his mental issues from his mother, who herself had mental issues.

D. Also in late 2007, Laszlo Mikulas, another DNSE Vice President, repeated to Hernandez the same statements that Galler had made to Hernandez about Schirle's mental issues.

E. Finally, in late 2007, Hernandez relayed the statements made by Galler and Mikulas about Schirle's mental issues to former DNSE employee Ron Hogan.

3

No. 11-10788

Schirle brought suit on August 14, 2008 in the 342nd District Court of Tarrant County, Texas.  In that petition, Schirle claimed violations of Texas law—statutory libel, libel per se, slander per se, business disparagement, and civil conspiracy. Prior to bringing suit, however, on July 11, 2008, Schirle, DNSE, and Sokudo USA entered into a tolling agreement under which they agreed to toll any limitations period applicable to Schirle's suit from July 12 through August 12, pending an ultimately unsuccessful mediation attempt. Appellees removed the case to the United States District Court for the Northern District of Texas on September 16, 2008.  Upon removal, Schirle added claims for Title VII discrimination, Title VII retaliation, and discrimination under 42 U.S.C. § 1981.  On October 22, 2010, Schirle filed an amended complaint, which for the first time alleged defamatory instances C, D, and E.  Appellees moved for summary judgment, which the district court granted.  Schirle timely appealed.

## II.  STANDARD OF REVIEW AND APPLICABLE LAW

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. *Prison Legal News v. Livingston*, 683 F.3d 201, 211 (5th Cir. 2012).  Summary judgment is appropriate where the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)).  In making this determination, all inferences are drawn in favor of the non-movant. *Id*. at 211.

Where federal jurisdiction is based on diversity, we apply the substantive law of the forum state, Texas, to those claims that arise under state law. *Aubris Res. LP v. St. Paul Fire & Marine Ins. Co.,* 566 F.3d 483, 486 (5th Cir. 2009) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938)) (additional citation omitted).  In resolving issues of state substantive law, we look to the final decisions of the state supreme court, which are binding, but if there is no decision directly on point, then we must determine how that court, if presented

4

with the issue, would resolve it. *Packard v. OCA, Inc.*, 624 F.3d 726, 729 (5th Cir. 2010). "The decisions of . . . intermediate appellate courts may provide guidance, but are not controlling." *Id.*

## III.  DISCUSSION

**A.    Title VII and Section 1981 Claims**

Title VII makes it unlawful for an "employer" to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Additionally, the Title VII retaliation section prohibits an "employer" from "discriminat[ing] against [its] employee[] . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter," such as racial/national origin discrimination. § 2000e-3(a). Under the familiar *McDonnell Douglas* framework, to survive a motion for summary judgment, the plaintiff must first make out his prima facie case of discrimination. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "If the plaintiff makes a prima facie showing, the burden [of production] then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *Id.* at 557. This same framework applies to racial discrimination claims under § 1981.[2]  *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 660 F.3d 211, 213 (5th Cir. 2011) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989)) (additional citations omitted).

---

[2] Section 1981, in relevant part, affords all persons within the United States the "same right . . . to make and enforce contracts" without respect to race. 42 U.S.C. § 1981.

No. 11-10788

### 1.    Schirle's Employer

A threshold inquiry under both Title VII discrimination and retaliation claims is whom Schirle had an employment relationship with for the purposes of Title VII.  In determining whether a given defendant is an employer, we use the standards laid out in *Deal v. State Farm County Mutual Insurance Co. of Texas*, 5 F.3d 117 (5th Cir. 1993), and summarized in *Muhammed v. Dallas County Community Supervision and Corrections Department*:

> Determining whether a defendant is an "employer" under Title VII involves a two-step process.  First, the court must determine whether the defendant falls within Title VII's statutory definition of an "employer."  Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . , and any agent of such a person . . . ."  If the defendant meets this definition, the court must then analyze whether an employment relationship exists between the plaintiff and the defendant.
>
> To determine whether an employment relationship exists within the meaning of Title VII, we apply a hybrid economic realities/common law control test.  The most important component of this test is the right to control the employee's conduct.  When examining the control component, we have focused on whether the alleged employer has the right to hire, fire, supervise, and set the work schedule of the employee. . . .  The economic realities component of the test focuses on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment.

479 F.3d 377, 380 (5th Cir. 2007) (footnotes and internal quotation marks omitted).  However, we have long held that "superficially distinct entities may be exposed to liability upon a finding that they represent a single, integrated

No. 11-10788

enterprise" (i.e., a single employer).[3] *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983).

By the terms of the secondment agreement between DNSE and Sokudo USA, Schirle remained a DNSE employee and DNSE retained responsibility for wages, benefits, and workers' compensation. These factors, however, only relate to the economic realities portion of the hybrid test from *Muhammed*. The more important right-to-control factors are ambiguously delineated. Sokudo USA had the right "to have [Schirle] return to DNSE," but DNSE also "reserve[d] the right to . . . discipline (including hire, fire and terminate)" Schirle. Therefore, it appears from the terms of the secondment agreement that both DNSE and Sokudo USA had the (more important) right to control Schirle's conduct.

## 2. Race/National Origin Discrimination

An employee establishes a prima facie case of discrimination if he can demonstrate that he

> (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

*McCoy*, 492 F.3d at 556–57. This case turns on the third and fourth elements of the *McDonnell Douglas* test.[4] Schirle alleges that he suffered an adverse

---

[3] In *Trevino*, we laid out four factors for "determining whether distinct entities constitute an integrated enterprise[:] . . . (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." We need not engage in this inquiry, however, because as we detail below Schirle has not adduced sufficient evidence on the substantive elements of his prima facie case for either his racial discrimination claim or his retaliation claim.

[4] It is clear from the record that Schirle (1) is a member of a protected group, *see McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976) (holding that white plaintiffs can bring racial discrimination claims under Title VII and § 1981), and (2) was qualified for the position at issue, based on his bachelor's and master's degrees in engineering as well as his twenty-five years in the semiconductor industry, including management

7

employment action when Suetake stripped him of his European sales responsibilities in late March 2007 and gave those responsibilities to Okamoto. Adverse employment actions under the *McDonnell Douglas* framework are limited to "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (emphasis omitted). Still, it is recognized that a significant diminishment of "material responsibilities," *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), or a demotion, *Pegram*, 361 F.3d at 282, also constitutes an adverse employment action under Title VII. Schirle's loss of his European sales responsibilities, leaving him only responsible for sales in the United States, is a diminishment of material responsibilities significant enough to satisfy the third element of his prima facie case of discrimination. This conclusion flows from our standard of review, which requires us to draw all inferences in Schirle's favor. Turning to the fourth element, the record reveals that in their "Responses to Plaintiff's Requests for Admissions," Appellees admitted that Okamoto, who replaced Schirle in being responsible for European sales, was "Japanese" and of the "Asian race." Therefore, Schirle has met his burden of making his prima facie case.

The question then becomes whether the adverse employment action taken by Suetake is attributable to DNSE and/or Sokudo USA. Title VII incorporates *respondeat superior* liability such that if Suetake were an agent/employee of either DNSE and/or Sokudo USA, that company would be liable for Suetake's actions. *Smith v. Amedisys, Inc.*, 298 F.3d 434, 448 (5th Cir. 2002). While there is no record evidence to suggest that Suetake was an agent of DNSE, the secondment agreement between DNSE and Sokudo USA shows that Suetake signed on behalf of Sokudo USA, as Sokudo USA's CEO. The secondment

experience in Japan.

agreement is governed by California law, and California adheres to the standard rule that "a corporation may act only through its officers, agents, and employees." *See Burdetee v. Carrier Corp.*, 71 Cal. Rptr. 3d 185, 202 (Cal. Ct. App. 2008) (alterations omitted). This is sufficient evidence to create a fact issue as to whether Suetake was Sokudo USA's agent, *see Borders Online LLC v. State Bd. of Equalization*, 29 Cal. Rptr. 3d 176, 182 (Cal. Ct. App. 2005) ("[I]ssues of agency typically are questions of fact."), which would allow Schirle to make a claim against Sokudo USA under Title VII. *See Amedisys*, 298 F.3d at 448. Nowhere in its briefing to this court or to the district court did Sokudo USA put forth a legitimate, non-discriminatory reason for the adverse employment action; summary judgment was therefore inappropriately granted to Sokudo USA. *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 618 (5th Cir. 2007).

### 3.    Retaliation

To make out a prima facie case of retaliation, the plaintiff must establish that "(1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy*, 492 F.3d at 556–57. As we have previously stated, Schirle has put forth no evidence that DNSE was his employer for Title VII purposes; thus, if his retaliation claim is to survive, it can only do so against Sokudo USA. Schirle cites four instances where he complained specifically of racial/national origin discrimination. While specific complaints about discrimination are clearly protected activity under Title VII, *see Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 551 (5th Cir. 2009), only one of Schirle's complaints was to Sokudo USA employees—his mid-February 2007 complaint to Suetake about Yado and Yana's harassment of him for being a foreigner. Following this complaint in late March 2007, Suetake stripped Schirle of his European sales responsibilities, which we have held constituted an adverse

employment action. Finally, the causal connection is met based on the near-one-month temporal proximity between Schirle's complaint to Suetake and Suetake's adverse employment action against Schirle. *See Evans v. City of Hous.*, 246 F.3d 344, 354 (5th Cir. 2001) ("Close timing between an employee's protected activity and an adverse action against [him] may provide the 'causal connection' required to make out a prima facie case of retaliation. We note that a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." (internal quotation marks and citation omitted)). As was the case with the discrimination claim, Sokudo USA has put forth no legitimate, non-retaliatory reason for the adverse employment action, and therefore, summary judgment was inappropriately granted. *See Alvarado*, 492 F.3d at 617.

**B.    Defamation**

Under Texas law, to maintain a cause of action for defamation, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with negligence regarding the truth of the statement (if the plaintiff is a private individual). *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).[5] Words are defamatory if they tend to harm a person's reputation. *Id.*; Tex. Civ. Prac. & Rem. Code § 73.001 (providing that a statement is defamatory if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation."). The plaintiff must bring a defamation suit not later than one

---

[5] Texas law recognizes both libel and slander. An action for libel requires publication to a third party of written defamatory words about the plaintiff, while slander requires defamatory words about the plaintiff to be spoken, without legal excuse, to a third party. *Alaniz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App.—Corpus Christi 2003, no pet.)*, abrogated on other grounds by Fort Brown Villas III Condominium Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879 (Tex. 2009).

No. 11-10788

year after the day the cause of action accrues. Tex. Civ. Prac. & Rem. Code § 16.002(a). Ordinarily, the cause of action accrues when the defamatory statement is published; under the discovery rule, however, "the statute of limitations does not begin to run until the injured party learns of, or, in the exercise of reasonable diligence, should have learned of the injury or wrong giving rise to the action." *Johnson v. Baylor Univ.*, 188 S.W.3d 296, 301 (Tex. App.—Waco 2006, no pet.).

### 1.    Instance A

Instance A comprises oral and written statements by Takimoto during an executive review meeting with representatives of Micron Technology on July 18, 2007. The district court determined that Schirle's defamation claim regarding Instance A is time-barred because Schirle did not bring suit until August 14, 2008—more than one year after the statement was made. Schirle argues that although Takimoto was a DSM employee, the statements were made within the scope of his employment to Sokudo USA; therefore, the statements should be covered by the tolling agreement between Schirle, DNSE, and Sokudo USA. Review of the record shows that Takimoto was seconded not to Sokudo USA, but to Sokudo Co., Ltd. (a separate legal entity). Therefore, the tolling agreement does not apply to Instance A. Moreover, the discovery rule cannot save this claim because Schirle admits to learning of it on July 19, 2007. The district court was correct in finding this claim untimely.

### 2.    Instance B

Instance B involves alleged libel by Otsuka, a President of DSD, made on October 19, 2007 in response to an inquiry by Henrich, who worked for a DSD third-party agent in Germany, about whether Schirle had left voluntarily. Otsuka responded: "I heard he's suffering from small mental disease, and not appearing to Sokudo USA office at all in this one month time." DSD does not assert a statute-of-limitations defense but contends that the statement is not

11

defamatory because of Texas's defense of substantial truth. "Under the 'substantial truth' doctrine, minor inaccuracies are not actionable as long as the publication's 'gist' or 'sting' is true, and a 'true' statement for these purposes is one that is not more damaging to the plaintiff's reputation than a literally true statement would have been." *Neely v. Wilson*, 331 S.W.3d 900, 915 (Tex. App.—Austin 2011, pet. granted). "If the underlying facts regarding the 'gist' of the statement are undisputed, then substantial truth can be determined as a matter of law." *Cram Roofing Co. v. Parker*, 131 S.W.3d 84, 90 (Tex. App.—San Antonio 2003, no pet.).

As the district court noted, Schirle's family doctor had referred to Schirle's condition as a "psychiatric condition." Furthermore, Schirle's psychiatrist had stated that Schirle had a "mood disorder," which he diagnosed as a "generalized anxiety disorder." DSD contends that "psychiatric condition" or "mood disorder" is substantially the same as Otsuka's statement that Schirle was "suffering from a small mental disease." In considering the gist of the two statements, we agree with the district court that Otsuka's statement was substantially true. Reading that Schirle had a "small mental disease" and reading that Schirle had a "psychiatric condition" or "mood disorder" does not evoke a markedly different conclusion in the mind of the reasonable reader. A literally true statement would have been just as damaging to Schirle's reputation. *Neely*, 331 S.W.3d at 915. We therefore find that the district court was correct in granting summary judgment against Schirle on Instance B.

### 3.    Instances C, D, and E

These instances relate to late 2007 oral statements made by Galler, Mikulas, and Hernandez that Schirle and his mother suffered from "mental issues." Unlike Instances A and B, however, these claims were not pleaded until October 22, 2010. As Texas only allows one year to bring a defamation claim, these claims can only be saved if they "relate back" to an earlier, non-time-

barred complaint.    Under the relevant portions of Federal Rule of Civil Procedure 15(c)(1), "[a]n amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; [or] (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence that set out—or attempted to be set out—in the original pleading."    The consequence of Rule 15(c)(1)(A) is that a claim will be deemed to "relate back" if relation back is permitted under state law, even if it is not permitted under federal law.    *See Coons v. Indus. Knife Co., Inc.*, 620 F.3d 38, 42 (1st Cir. 2010).

Under federal law, a newly asserted claim relates back to a claim asserted in the original petition if they arose out of the same "conduct, transaction, or occurrence"; that is, a "common core of operative facts" must unite the original claim and the newly asserted claim.    *Mayle v. Felix*, 545 U.S. 644, 659 (2005). Under Texas law, a newly asserted claim relates back unless it "is wholly based on a new, distinct, or different transaction or occurrence."    Tex. Civ. Prac. & Rem. Code §  16.068 (2008).    "Texas law treats each alleged defamatory publication as a single transaction with an independent inquiry."    *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 587 (Tex. App.—Austin 2007, pet. denied).

Under neither federal nor Texas law do Instances C, D, and E relate back because they are factually distinct. The statements, though similar, have factual differences (e.g., discussing Schirle's mother's alleged mental issues in addition to Schirle's) and the speakers are different as well.  Moreover, we agree with the district court that the discovery rule cannot save Schirle's claims because the claims were not "inherently undiscoverable."    *See Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex. 1997) ("The discovery rule applies if: (1) the injury is inherently undiscoverable; and (2) the evidence of the injury is

objectively verifiable."). The district court correctly found Instances C, D, and E untimely.

## IV.  CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Sokudo USA as to Schirle's discrimination and retaliation claims but AFFIRM it in all other aspects.

REVERSED IN PART, AFFIRMED IN PART; REMANDED.